# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOSEPH DANIEL WAUHOP, On Behalf Of Himself and All Others Similarly Situated,    ) ) ) ) | |
| Plaintiff,    ) ) | |
| v.    ) ) | Civil Action No. _____ |
| XYBERNAUT CORPORATION, EDWARD G. NEWMAN, STEVEN A. NEWMAN, M.D., THOMAS D. DAVIS, JOHN F. MOYNAHAN, and GRANT THORNTON, LLP,    ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants.    ) | |

## CLASS ACTION COMPLAINT
## FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff, by his undersigned attorneys, by way of this Complaint, alleges the following, upon personal knowledge as to himself and his acts and as to all other matters, upon information and belief, based upon, *inter alia*, the investigation made by and through his attorneys, including a review of the public filings of Xybernaut Corporation ("Xybernaut" or "the Company") with the United States Securities and Exchange Commission ("SEC"), as well as certain published reports and news articles.

## PARTIES

1.    Plaintiff, Joseph Daniel Wauhop, as set forth in his attached Certification, which is incorporated herein by reference, is a resident of Prince William County, Virginia, purchased shares of Xybernaut common stock in the open market between May 10, 2002 and April 8, 2005, inclusive (the "Class Period"), and suffered damages as a result of those purchases.

2.    Defendant, Xybernaut, is a Delaware corporation, with its principal executive

offices and headquarters located at 12701 Fair Lakes Circle, Fairfax, Virginia.

3.      Defendant, Edward G. Newman ("E. Newman"), at all times relevant hereto, was the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors ("the Board").

4.      Defendant, Steven A. Newman, M.D. ("S. Newman"), at all times relevant hereto, was the Company's President and Chief Operating Officer ("COO") and Vice Chairman of the Board.

5.      Defendant, Thomas D. Davis ("Davis"), was the Company's Chief Financial Officer ("CFO") and Senior Vice President from on or about November 14, 2002 through November 17, 2004.

6.      Defendant, John F. Moynahan ("Moynahan"), was the Company's CFO and Senior Vice President from 1994 through 1998, and then rejoined Xybernaut as CFO in 1999. On or about November 14, 2002, he became Xybernaut's executive vice president for international operations.  Moynahan left the Company sometime thereafter.

7.      Defendants, E. Newman, S. Newman, and Davis are referred to collectively herein as the "Individual Defendants."

8.      Defendant, Grant Thornton, LLP ("Grant Thornton"), is the U.S. member firm of Grant Thornton International, one of six global accounting, tax and business advisory organizations, and its principal executive offices and headquarters are located at 175 West Jackson Boulevard, Chicago, Illinois.  Grant Thornton's Northern Virginia office is located at 2070 Chain Bridge Road, Vienna, Virginia.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action under the

Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. §1331.

The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C.

§§ 78j(b) and 78t(a), as well as Rule 10b-5, 17 CFR § 240.10b-5, as promulgated by the SEC.

10.      Venue is proper in this district pursuant to the provisions of the Exchange Act and

28 U.S.C. § 1391(b).  Xybernaut is a Delaware corporation that maintains a registered office or

agent in this judicial district.  Grant Thornton is a limited liability partnership which maintains a

registered office or agent in this judicial district.

11.      In connection with the acts, conduct and violations of law detailed in this

Complaint, Defendants, at all relevant times, directly and indirectly, utilized the means and

instrumentalities of interstate commerce, including the mails, telephone communications and the

facilities of the national securities exchanges.

## BACKGROUND REGARDING XYBERNAUT

12.      This is a securities class action brought on behalf of all persons, other than the

Defendants and related parties, who purchased or otherwise acquired shares of Xybernaut

common stock and other securities in the open market during the Class Period (the "Class").

13.      Xybernaut was co-founded in 1990 by E. Newman, and completed its initial

public offering (the "IPO") on July 18, 1996.  As further alleged herein, although neither

Xybernaut nor the Individual Defendants are named, the activities of the underwriters of the IPO

are the subject of a federal grand jury indictment handed down in the United States District Court

for the Eastern District of New York.

14.     Until the Nasdaq Stock Market ("Nasdaq") announced its intention to delist the Company's stock as of April 14, 2005, it was traded on the Nasdaq under the symbol "XYBR." Thereafter, the stock traded under the symbol "XYBRE." Effective May 12, 2005, following an oral hearing before a Nasdaq Listing Qualifications Panel, the Company's stock was delisted from Nasdaq. Consequently, Xybernaut stock now trades under the symbol "XYBR.PK" in the "pink sheets" via the OTC Bulletin Board.

15.     As described in the Company's annual report for fiscal year 2002 (ended December 31, 2002), which was filed with the SEC on Form 10-K on March 28, 2003 (the "2002 10-K"), Xybernaut is engaged in, *inter alia*, "the research, development, manufacture, marketing and sales of mobile, wearable computing and communication systems." The Company also offers service-type software through its wholly-owned subsidiary, Xybernaut Solutions, Inc. ("XSI"), as well as hardware-type products through its wholly-owned foreign subsidiaries, Xybernaut K.K. (Japan) and Xybernaut GmbH (Germany).

16.     Xybernaut's primary product consists of the Mobile Assistant® ("MA") series, the most current versions of which are the Mobile Assistant V ("MA V") and the Mobile Assistant TC ("MA TC"). According to the 2002 10-K, "[s]ince its commercial introduction in 1995, the Company has recognized revenue of approximately $19,500,000 on sales of approximately 4,000 units of the MA series." In addition, Xybernaut "derives its revenues from sales of its wearable computers, software products and consulting services." In 2002, Xybernaut introduced the Atigo™ product line, a family of wireless web panels that can be used either as stand-alone handheld personal computers or as displays for an MA system, a laptop, or a conventional PC.

17.     As described in the July 18, 2001 issue of <u>The New York Times</u>, the MA V is a

-4-

wearable computer which can attach to a belt, weighs approximately 22 ounces, and is about the size of a Sony Walkman. The basic model costs about $4000 and is designed for use by government agencies, the military, the transportation sector, and any line of work that requires free hands and a high degree of field workforce automation.

18.    On September 17, 1999, the Company filed a current report on Form 8-K with the SEC (the "September 1999 8-K"), wherein Xybernaut reported that it had dismissed PricewaterhouseCoopers LLP ("PwC") as its independent accountant on September 13, 1999. However, prior to being dismissed, PwC had made a report to the Company's Audit Committee, which addressed "a material weakness related to **the Company's policies and procedures for the recognition of revenue** during the year ended December 31, 1998." (Emphasis added). In the September 1999 8-K, Xybernaut reported that, in response to PwC's criticism, it had "reversed approximately $700,000 of revenue in the fourth quarter on certain of these transactions." Xybernaut further reported that it had "revised its policies and procedures for the recognition of revenue in accordance with the recommendation of PricewaterhouseCoopers LLP and the [Company's] management is of the opinion that the material weakness noted by PricewaterhouseCoopers LLP has been corrected and that a material weakness no longer exists in this regard." The September 1999 8-K also announced that Xybernaut had engaged Grant Thornton as its new independent accountant as of September 13, 1999.

## BACKGROUND REGARDING GRANT THORNTON

19.    Grant Thornton emphasizes its position in the public accounting market as the alternative to the Big 4 accounting firms (Deloitte Touche, Ernst & Young, KPMG, and PwC). An April 15, 2005 Grant Thornton press release criticizes the "ongoing consolidation and

resulting concentration in the accounting profession" and suggests that "[m]isperceptions among capital markets influencers who believe only the four largest firms are capable of auditing public companies further limits company choice." Thus, among the competitive advantages listed on its website, Grant Thornton states that "[f]rom our top management on down, Grant Thornton is strategically committed to serving mid-cap, small-cap and privately held client companies [and] [u]nlike most Big Four client service professionals, our partners and staff have no other priorities." Similarly, a February 9, 2005 press release issued by Grant Thornton mentions that "Grant Thornton LLP picked up more than 1,000 new client engagements from Big 4 clients; situations in which most, if not all, the engagements were actively pursued by Big 4 firms."

20.    Grant Thornton also emphasizes its selectivity in undertaking audit work. In the February 9, 2005 press release, Grant Thornton states that "[o]f the more than 1,000 new engagements, only 23 were cases in which the former Big 4 firm resigned from the client." Likewise, a press release issued by Grant Thornton on December 9, 2004 notes that it was able to achieve "excellent revenue growth in fiscal 2004 while still rejecting many large fee engagements that didn't clear its client acceptance process" and that "[a]mong the global accounting organizations in the U.S., Grant Thornton LLP posted the lowest ratio of new clients whose previous auditor had identified accounting issues during the first nine months of 2004."

21.    In the wake of the accounting reforms enacted by the Sarbanes-Oxley Act of 2002, Grant Thornton has continually proclaimed its benefits to the capital markets and investors. In the December 9, 2004 press release, Grant Thornton claims it was the "[f]irst of the global accounting organizations to suggest post-Enron accounting reforms ... many of [which] eventually were included in Sarbanes-Oxley legislation" and was "[a]sked by the Senate Banking

Committee to offer insights on the Sarbanes-Oxley corporate disclosure legislation one year after its passage." More recently, in an April 5, 2005 letter to the SEC (a copy of which was posted on Grant Thornton's website), Grant Thornton advocated that communications between auditors and their clients should include "detailed conversations with clients about accounting issues," the provision of "training and literature to clients about new or pending accounting pronouncements," and the ability to "review and comment on a client's planned accounting methodologies."

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

22. The Class Period begins on May 10, 2002, the next trading day following the Company's May 9th press release announcing Xybernaut's first quarter financial results for fiscal year 2002. The press release, entitled "Xybernaut Reports Record First Quarter 2002 Revenue; Achieves 24% Revenue Increase Over First Quarter of 2001 and Announces Guidance Increase For Quarterly Revenue Through 2002," stated as follows:

> Xybernaut Corporation (Nasdaq:XYBR) today announced quarterly revenues of $2.8 million for its first quarter ended March 31, 2002, the highest first quarter results in the Company's history. This represents a 24% increase compared with $2.3 million for the corresponding period a year ago.
> Hardware revenue for the quarter was $1.8 million, an increase of 38% from $1.3 million for the same period in the prior year. The net loss applicable to holders of common stock for the first quarter was $8.0 million, or $0.13 per share, compared with $5.9 million, also $0.13 per share, for the same period in the prior year.

> * * *

> "We are now beginning to see tangible results from the investments we have made in developing our technology platforms and our efforts to cultivate strategic vertical industry sectors," said

> Edward G. Newman, chairman, president and CEO for Xybernaut.
> "We have realized considerable success in various metrics that we
> consider key indicators of strong revenue growth. In addition, our
> restructuring activities are progressing well and we expect to
> achieve the savings outlined in our earlier announcement."
>
> * * *
>
> The Company is increasing quarterly revenue guidance for the
> remainder of this year to 30% to 60% increases in revenue from the
> same quarters in the prior year.
> This guidance is up from the 25% to 50% quarterly increase
> previously provided. This guidance range indicates expected
> revenues of $2.6 million to $3.2 million for the second quarter
> ending June 30, 2002.

23.     On May 15, 2002, Xybernaut filed its financial results for the first quarter of fiscal

year 2002 with the SEC on Form 10-Q, which was signed by E. Newman, Davis (who was then

the Company's Vice President of Finance), and Moynahan.  This 10-Q reiterated the financial

information contained in the May 9th press release.  Upon information and belief, in accordance

with Rule 10-01(d) of Regulation S-X (codified at 17 C.F.R. § 210.10-01(d)), Grant Thornton

performed a review of these financial statements before they were filed with the SEC.

24.     On June 19, 2002, Xybernaut issued a press release regarding the Company's

annual shareholders' meeting held the day before, during which it was announced that the

Company would become profitable in 2003.  The press release further provided as follows:

> "2001 exemplified the overall success of Xybernaut on many
> fronts," said [E.] Newman.  "Our revenue growth, including the
> fourth quarter's record wearable computer hardware revenues, was
> encouraging and benefited [sic] from strong organic growth as well
> as additions to revenue through our successful Team Xybernaut
> channel community which now contains more than 100 member-
> companies."
> "During each successive quarter in 2001," Newman added. "We
> were able to demonstrate important progress with customers and

-8-

partners; further enhance and expand our products; and continue to demonstrate our ability to access and utilize capital for shareholder value."

* * *

"Given our restructuring efforts, expected margin improvements for new products and increasing customer order rates, we are targeting Xybernaut to be profitable by the end of the second quarter of 2003," said Newman.

25.    On June 19, 2002, trading volume in Xybernaut stock was heavy – over 1 million shares were exchanged. The price per share for the Company's stock opened at $0.84 per share and, after trading as high as $0.93 per share, closed at $0.86 per share. However, starting on June 26, 2002, the trading volume was extraordinarily active, with over 4 million shares traded on June 28, 2002. The price per share of the Company's stock plummeted that day by $0.18.

26.    On July 1, 2002, Xybernaut issued a press release in which it asserted that "it was unaware of any operational reasons that would explain the recent decline in its share price or heavy trading activity." The press release continued as follows:

Separately, the company reiterated its second quarter and 2002 guidance. The company expects to report quarterly revenue increases for the remainder of this year of between 30% and 60%, compared with the same quarters in 2001. In addition, the Company is on track to meet its stated objective of reaching profitability in the second quarter of 2003.

"We continue to show significant progress in our relentless drive for profitability," said Edward G. Newman, Xybernaut's chairman, president and CEO. "We have reduced our expenses dramatically, while increasing revenue from our enterprise customers. ... In short, we begin the third quarter with the largest backlog in the company's history and we have never been in a better position to increase revenues while tightly managing expenses. If anything, our business has improved greatly in recent weeks, which will be reflected in up-coming announcements I am confident that our

stock price will eventually reflect both our improved operations as well as the tremendous growth we have ahead of us."

27.    However, the optimism proved short-lived. In a press release issued on July 3, 2002, Xybernaut stated as follows:

> Xybernaut(R) Corporation (NASDAQ:XYBR) announced today that certain significant orders outside the U.S. did not occur as anticipated and, as a result, the Company is now expecting revenues for the quarter ending June 30, 2002 to approximate the $2 million in revenues realized for the same period last year. In addition, the Company clarified Mr. Newman's remarks made Monday related to backlog noting that its current pipeline of potential orders, rather than its backlog, has reached record levels.
>
> The Company's previous guidance for revenues in the third and fourth quarters of 2002 and profitability by second quarter of 2003 remains unchanged.

The July 6, 2002 edition of The Washington Post reported on the erroneous press release, observing that "[t]he original release sent the company's shares soaring 33 percent, but the correction issued Wednesday that said sales were flat at $2 million caused the stock to fall back 17 percent. It rebounded nearly 2 percent yesterday."

28.    On July 11, 2002, the Company announced in a press release that it had "raised more than $5 million in equity capital through a $4 million private placement of common stock with institutional investors and an exercise of approximately $1 million of previously issued warrants." The press release quoted E. Newman as stating that the financing represented "a strong endorsement of our technology in an extremely challenging equity market" and that the Company continued "to make progress on obtaining strategic capital while our cost cutting efforts and forecasted revenue growth will improve our cash flows from operations."

29.    On August 13, 2002, the Company issued a press release entitled "Xybernaut

-10-

Reports Second Quarter 2002 Results in Line With Revised Guidance; Operating Expenses

Decrease 21%; Additional Actions Implemented to Significantly Reduce Expenses." Therein,

the Company stated as follows:

> Xybernaut(R) Corporation (Nasdaq: XYBR) today announced
> quarterly revenues of $2.0 million for its second quarter ended
> June 30, 2002, or approximately the same as revenues for the
> second quarter a year ago, and consistent with prior revised
> guidance. The net loss for the second quarter was $6.7 million, or
> $0.10 per share, compared with $8.5 million, or $0.17 per share,
> for the same period in the prior year.
>
> Hardware revenue for the quarter was $1.2 million, an increase of
> 102% from $0.6 million for the same period in the prior year.
> Operating expenses for the second quarter were $6.9 million, not
> including restructuring charges, a reduction of 21% from $8.7
> million in the first quarter ending March 31, 2002 and a reduction
> of 31% from $10.1 million in the fourth quarter ending December
> 31, 2001.
>
> Revenue for the six months ended June 30, 2002 was $4.8 million,
> representing an increase of 12% versus revenue of $4.3 million for
> the same period a year ago. The Company reported a net loss of
> $14.7 million for the first six months of 2002, or $0.23 per share,
> versus a loss of $14.4 million, or $0.30 per share, for the first six
> months of 2001.
>
> "We are now beginning to see tangible results from the
> restructuring actions initiated earlier this year. These actions have
> included reductions in workforce, reductions in overseas operations
> and salary reductions for top executives ranging from 20-25%,"
> said Edward G. Newman, chairman, president and CEO for
> Xybernaut. "With these cost reductions and expected revenue
> increases, we look forward to achieving our target of profitability
> in 2003," Newman added.

Xybernaut also issued revenue guidance in this press release, stating that it "reaffirmed revenue

guidance for the third and fourth quarters of 2002 at a 30% to 60% increase from the equivalent

quarters in the prior year; however, the Company also noted that the timing of orders and

-11-

shipment of product could affect the timing of revenue realized in each of those quarters."

30.     That same day, Xybernaut filed its financial results for the second quarter of fiscal year 2002 with the SEC on Form 10-Q, which reiterated the financial information contained in the August 13th press release. The 10-Q was signed by E. Newman, Davis, and Moynahan. Upon information and belief, in accordance with Rule 10-01(d) of Regulation S-X (codified at 17 C.F.R. § 210.10-01(d)), Grant Thornton performed a review of these financial statements before they were filed with the SEC.

31.     Two days later, Xybernaut issued a press release announcing that E. Newman and Moynahan had complied with the certification requirements of Section 906 of the Sarbanes-Oxley Act of 2002, codified at 18 U.S.C. § 1350. The press release quoted E. Newman as stating that "Xybernaut supports all efforts to boost investor confidence," and that "[c]ertifying financial results reinforces our ongoing dedication to provide the investing community with clear and accurate information."

32.     In a press release issued before trading on November 6, 2002, Xybernaut announced that the Company's wearable computers had been purchased and were being used in the Waldorf-Astoria Hotel in New York City. In response to this announcement, the price per share of Xybernaut stock gained $0.07 per share, to close at $0.44. The next day's trading activity was more extraordinary. As CBS MarketWatch reported, the Company's share price had "surged more than 77 percent on heavy volume of more than 19 million shares." The price per share of the Company's stock closed at $0.78 on November 7, 2002.

33.     On November 14, 2002, Xybernaut issued a press release announcing its financial results for the third quarter of fiscal year 2002. Emphasizing increased revenues and a reduction

in operating expenses, the press release stated as follows:

> Xybernaut® Corporation (Nasdaq:XYBR) today announced
> quarterly revenues of $2.5 million for its third quarter ended
> September 30, 2002. This represents an increase of approximately
> 26% from revenues during the preceding second quarter of 2002
> and an increase of approximately 10% over revenues during the
> comparable third quarter of 2001. The net loss for the third quarter
> was $7.9 million, or $0.10 per share, compared with $8.1 million,
> or $0.15 per share, for the same period in the prior year.
>
> Operating expenses, excluding restructuring and other non-
> recurring charges, for the third quarter of 2002 were $6.0 million, a
> reduction of 41% from the fourth quarter of 2001 and 14% from
> the preceding second quarter of 2002.
>
> Revenue for the nine months ended September 30, 2002 was $7.4
> million, representing an increase of 11% versus revenue of $6.6
> million for the same period a year ago. The Company reported net
> losses of $22.5 million for both the first nine months of 2002 and
> 2001.
>
> "Throughout 2002, Xybernaut has successfully introduced new
> product lines, gained traction in critical industry segments, ...
> strengthened our intellectual property position and demonstrated
> our ability to raise capital despite difficult market conditions,"
> stated Edward G. Newman, chairman, president and CEO.
>
> "We continue our drive to profitability and see significant benefits
> from the restructuring and cost cutting initiatives we have
> undertaken throughout 2002," continued Newman. "We expect to
> reduce our operating expenses by 50% over prior levels. We have
> significantly reduced our headcount, restructured agreements with
> vendors and partners, reduced inventory commitments and
> implemented various other cost saving strategies such as
> consolidating international operations."

34.    In addition to the financial results, the November 14th press release announced the

promotion of Davis from the Company's Vice President of Finance and Controller to the position

of CFO. Furthermore, it was announced that Moynahan, the Company's former CFO, was being

"promoted" to Executive Vice President, International Operations. The press release further

stated as follows:

> "Tom has done an excellent job of maintaining a strong focus on cost management. His business and financial acumen and proven leadership abilities will serve the Company well as he moves into his new role," said Newman. "Tom has my utmost confidence as our new CFO and it is a pleasure to promote him to this position. Additionally, we are fortunate to have John's continued financial guidance during the transition period." Davis has over 10 years of finance and accounting experience and has served as controller and vice president of finance since joining Xybernaut in 1999. Prior to Xybernaut, Davis held various senior finance and accounting positions, including director of finance at MeriStar Hospitality Corporation. While with MeriStar, Davis was active in the company's 1996 initial public offering, and played a key role in raising $3 billion through debt and equity instruments. Davis also served as a senior auditor and certified public accountant (CPA) with Deloitte & Touche. Davis graduated magna cum laude from James Madison University.

35.    That same day, Xybernaut filed its financial results for the third quarter of fiscal

year 2002 with the SEC on Form 10-Q, which reiterated the financial information contained in

the November 14th press release. The 10-Q was signed by E. Newman and Davis, as was the

Sarbanes-Oxley Section 906 Certification and the more comprehensive Certification required by

Section 302 of the Sarbanes-Oxley Act (codified at 15 U.S.C. § 7241(a)) (collectively, the

"Sarbanes-Oxley Certifications") that, *inter alia*, the financial information "does not contain any

untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not

misleading with respect to the period covered by this quarterly report" and "any fraud, whether or

not material, that involves management or other employees who have a significant role in the

registrant's internal controls" had been disclosed. Upon information and belief, in accordance

with Rule 10-01(d) of Regulation S-X (codified at 17 C.F.R. § 210.10-01(d)), Grant Thornton

performed a review of these financial statements before they were filed with the SEC.

36.    On January 6, 2003, the Company issued a press release containing the New

Year's message of E. Newman to Xybernaut's shareholders and supporters.  Commenting on the

Company's "record" backlog and continued reduction in expenses, E. Newman assured readers

that the Company was focused on reaching profitability.  The press release further stated:

> First, unlike many other technology companies large and small,
> Xybernaut is growing and has maintained its leadership position
> despite difficult market conditions. ...  We are focused on reaching
> profitability and recognize that to do so we must not only grow
> revenues but also operate as a much more streamlined company.
> We have significantly reduced expenses and successfully
> consolidated many functional areas. ...  The Atigo(TM) product
> family demonstrates our success in streamlining product
> development and delivery to the point where final shipment (and
> subsequent revenue recognition) of customized systems can be less
> than 120 days from purchase order receipt. ...  In summary, we
> made tangible progress on many fronts in 2002.  I hope the above
> glimpse of some of these developments gives you a better
> perspective of the Company as it enters the New Year.

37.    On March 27, 2003, the Company announced its financial results of the fourth

quarter and fiscal year 2002.  Before the opening of trading that day, the Company issued a press

release, which stated as follows:

> Total revenues for 2002 were $10.0 million, a 2% increase over
> 2001.  These results include a 17% increase in 2002 hardware
> revenues to $6.1 million.  Total revenues for the fourth quarter
> ended December 31, 2002 were $2.6 million, representing an
> increase of approximately 2% over revenues during the third
> quarter of 2002.  Net operating expenses for the fourth quarter of
> 2002 were $4.5 million, a reduction of 56% from the fourth quarter
> of 2001 and 26% from the third quarter of 2002. ...  Net loss for
> 2002 decreased 17% from $32.2 million, or $0.63 per share, for
> 2001 to $26.6 million, or $0.37 per share, for 2002.

"Xybernaut continues to achieve considerable success despite challenging market conditions," stated Edward G. Newman, chairman, president and CEO. ... "We have reorganized our management structure and strengthened our corporate governance through the appointment of two new independent directors to our board ..." added Newman. "I am very pleased to announce that Xybernaut has surpassed our previously stated targets related to reductions in operating expenses, as evidenced by the 56% decline in net operating expenses for the fourth quarter of 2002 over the comparable 2001 period," stated Tom Davis, senior vice president and CFO. "Additionally, we have recently been successful in eliminating a considerable amount of long-term liabilities and commitments relating to both product and inventory."

38.    In response to this news, almost 2 million shares were traded on March 27, 2003, more than double that of the previous trading day's trading volume. The Company's share price closed down at $0.37 per share.

39.    On March 28, 2003, Xybernaut's 2002 10-K, signed by the Individual Defendants, was filed with the SEC. It reiterated the financial information contained in the March 27th press release. In addition, the Sarbanes-Oxley Certifications were executed by E. Newman and Davis. The 2002 10-K also included a report from Grant Thornton, which stated that it had audited Xybernaut's financial records as of December 31, 2002 and 2001 "in accordance with auditing standards generally accepted in the United States of America" and, as a result, it was able to opine that the financial information "present fairly, in all material respects, the financial position of Xybernaut Corporation as of December 31, 2002 and 2001, and the results of its operations and its cash flows for the three years then ended in conformity with accounting principles generally accepted in the United States of America."

40.    On April 2, 2003, Xybernaut issued a press release, announcing that it had "raised $6.1 million through a $2.0 million private placement of common stock with institutional

-16-

investors, a long-term borrowing of $1.75 million and exercises of approximately $2.4 million of previously issued warrants." E. Newman was quoted as saying that the Company's "recent 2002 results emphasize [that] the Company is achieving considerable accomplishments while utilizing far fewer resources."

41.   On April 3, 2003, the trading volume was over 4.8 million, more than double that of the previous day. The Company's share price, which had traded as high as $0.45, closed up at $0.42 per share.

42.   On May 1, 2003, Xybernaut announced that E. Newman was relinquishing some of his management responsibilities to his older brother, S. Newman. The press release stated that S. Newman had been elevated to the Company's President and COO, and that E. Newman would remain as CEO and Chairman of the Board.

43.   On May 15, 2003, Xybernaut announced its financial results for the first quarter of fiscal year 2003. The press release stated as follows:

> Total revenues for the three months ended March 31, 2003 were $1.8 million, a 36% decrease from the comparable period in 2002. Total operating expenses for the first quarter of 2003 were $4.2 million, a reduction of 52% from the first quarter of 2002 and 59% from the fourth quarter of 2001. As a result of the Company's cost cutting initiatives, the net loss for the first quarter of 2003 decreased 33% to $5.4 million, or $0.04 per share, from $8.0 million, or $0.13 per share, in the first quarter of 2002. "While we are not pleased with the revenue results for the first quarter, we were able to significantly reduce both operating expenses and net loss," said Steven A. Newman, president. "These significant accomplishments were the result of a combination of factors including reductions in headcount and other cost-cutting efforts." Newman, who was recently named Company president, pointed out that in the first quarter the Company revamped its direct and channel sales strategy and initiated changes that he believes will lay the foundation for increasing revenue. "Our revenue results

-17-

were impacted by orders that were delayed in the first quarter, a
sluggish economy and a continued slowdown in technology
spending. Nonetheless, I take complete responsibility for our
results and I am resolved to both significantly grow revenues and
increase shareholder value," he added. ... Edward G. Newman,
chairman and CEO added, "We continue to see significant benefits
from our restructuring and cost cutting efforts, surpassing our
stated goal to reduce operating expenses by 50% over prior levels,
and we expect the second quarter to be one of our best ever."

44.    On May 15, 2003, in response to the Company's earnings announcement, trading

volume was over 4.5 million, and the price per share closed at $0.41 per share.

45.    That day, the Company filed its financial results for the first quarter of fiscal year

2003 with the SEC on Form 10-Q, which was signed by the Individual Defendants. It reiterated

the financial information contained in the May 15th press release. The Individual Defendants also

executed the Sarbanes-Oxley Certifications. Upon information and belief, in accordance with

Rule 10-01(d) of Regulation S-X (codified at 17 C.F.R. § 210.10-01(d)), Grant Thornton

performed a review of these financial statements before they were filed with the SEC.

46.    On June 19, 2003, Xybernaut announced the completion of financing valued at

approximately $7.75 million through private stock placements and the exercise of warrants. The

Company's press release quoted E. Newman as saying: "This financing strengthens our cash

position and will allow us to aggressively pursue new business opportunities and partnerships [as

well as] financing for product development, focused sales and marketing initiatives and debt

reduction. When combined with our recent reductions of operating expenses, the completion of

this financing allows the company to focus on near term milestones and long term growth."

47.    On July 9, 2003, Xybernaut issued a press release regarding its expected financial

results for the second quarter of fiscal year 2003, ended June 30, 2003. The Company predicted

-18-

revenue would "increase more than 50% compared to revenue for the first quarter of 2003 [and] would be the highest quarterly percentage increase since the Company's acquisition of Xybernaut Solutions Inc. in 2000." The press release further stated as follows:

> "These results reinforce our previous expectations that the second quarter would be a pivotal quarter in setting the stage for the Company's future," said Steven A. Newman, president of Xybernaut Corporation. "Based on what we have seen in the second quarter and the first few days of the third quarter, we anticipate increased momentum and success through 2003 and beyond." Newman noted that this optimism is based on the objective measurement of numerous strategic Company initiatives including: cost-cutting programs; beneficial financings; intellectual property licensing strategies; strategic partnerships and the securing of key accounts in the transportation, retail, military and homeland security sectors.

48.    In response to this announcement, the price of Xybernaut stock traded as high as $0.76 per share before closing at $0.71 per share, an increase of $0.14. Trading volume was extraordinarily heavy, exceeding 33 million shares.

49.    On August 11, 2003, Xybernaut announced its financial results for the second quarter of fiscal year 2003, ended on June 30, 2003. Total revenue was reported as $2.8 million, or "a 56% increase from the preceding first quarter of 2003, and a 38% increase from the comparable period in 2002." S. Newman was quoted as stating that "[t]he Company is moving in the right direction in virtually all areas," and Davis stated that "[w]e have continued our cost cutting efforts into 2003 [and] streamlined operations."

50.    On this news, trading volume in the Company's stock approached 20 million, well above the previous day's volume. Xybernaut stock traded as high as $0.90 per share, before closing at $0.80 per share.

51.     On August 13, 2003, the Company filed its financial results for the second quarter of fiscal year 2003 with the SEC on Form 10-Q, which was signed by the Individual Defendants. It reiterated the financial information contained in the August 11th press release. The Sarbanes-Oxley Certifications were also executed by the Individual Defendants. Upon information and belief, in accordance with Rule 10-01(d) of Regulation S-X (codified at 17 C.F.R. § 210.10-01(d)), Grant Thornton performed a review of these financial statements before they were filed with the SEC.

52.     On September 10, 2003, Xybernaut announced that it had been awarded a contract worth $1.62 million by the U.S. Department of Defense. On that same day, the Company's stock closed at $1.25, up $0.10 per share, on trading volume in excess of 51 million shares. Early the next week, on September 15, 2003, the Company announced a $510,000 hardware contract with the U.S. Department of Defense. Trading volume that day was over 33 million shares, and the Company's stock price closed at $1.60 per share.

53.     On September 18, 2003, CBS MarketWatch reported that the share price of Xybernaut stock had reached a new 52-week high. According to this report:

> Shares of Xybernaut stretched recent gains on Thursday, pushing to a new 52-week high that has the stock up more than 100 percent in a mere four sessions. The Fairfax, Va., maker of wearable computer technology saw intense buying in its stock with 37 million shares changing hands in less than three hours of trading. News issued Wednesday that the company would unveil a new product Thursday during a presentation at the DEMOmobile 2003 Conference has sustained recent interest. ... The rally actually began in earnest on Sept. 10 when Xybernaut disclosed a $1.6 million order from the Department of Defense. The stock has moved higher in five of the six sessions since that announcement. In recent trading, shares changed hands at $2.54, up 62 cents, on the day, or 32 percent. The peak for the session stands at $2.66, a

far cry from the issue's dark days last October when it plummeted to a low of 19 cents. On August 11, Xybernaut posted a loss of $3.3 million, or 2 cents per share, on revenue of $2.8 million for the second quarter ended June 30. This performance represented a marked improvement from its loss of $6.7 million, or 10 cents per share, on revenue of $2 million in the same period a year earlier.

54.    On September 29, 2003, Xybernaut announced the completion of a private stock placement with institutional investors for approximately $7 million, which gave the Company approximately $13 million in cash. According to Davis, this was Xybernaut's "strongest financial position since the initial public offering." This press release further stated as follows:

"We've seen positive results in recent quarters from our sales, marketing and business development efforts; we've introduced new and innovative products; we've secured important patents while aggressively protecting our intellectual property; and we are involved in numerous business ventures with key partners," said Edward G. Newman, Xybernaut chairman and CEO. "By taking advantage of this opportunity to strengthen our capital structure, Xybernaut is in a better position than ever to extend our recent positive momentum and continue to deliver the results that our customers and stakeholders deserve."

55.    On November 13, 2003, the Company announced its financial results for the third quarter of fiscal year 2003, ended September 30, 2003. The Company emphasized increased revenues ($2.7 million, 6% greater from the third quarter of fiscal year 2002), record cash and equity balances (as of September 30, 2003, the Company had no debt and "record stockholders' equity of over $17 million"), and the seventh consecutive quarter of decline in "net operating expenses." Davis was quoted as saying that he continued "to believe that we have the strongest financial position since our IPO," and E. Newman was quoted as stating that the Company's "future has never looked brighter."

56.    In response to this news, Xybernaut stock traded as high as $2.23 per share, before

-21-

closing at $1.99 per share that day.  Volume was heavy at 16.5 million shares.

57.    On November 13, 2003, the Company filed its financial results for the third

quarter of fiscal year 2003 with the SEC on Form 10-Q, which was signed by the Individual

Defendants.  It reiterated the financial information contained in the November 13th press release.

The Sarbanes-Oxley Certifications were also executed by the Individual Defendants.  Upon

information and belief, in accordance with Rule 10-01(d) of Regulation S-X (codified at 17

C.F.R. § 210.10-01(d)), Grant Thornton performed a review of these financial statements before

they were filed with the SEC.

58.    On January 8, 2004, Xybernaut announced that it expected its financial results for

the fourth quarter and full fiscal year 2003 to be at "record levels."  In the Company's press

release, E. Newman was quoted as follows:

> "I stated earlier that I was very optimistic about our Q4 results and
> I view today's announcement as just the latest validation of the
> many strategic initiatives we have undertaken.  Management firmly
> believes that the best is yet to come and we expect to extend the
> positive momentum the Company is currently experiencing."

59.    On March 9, 2004, Xybernaut announced its financial results for fiscal year 2003,

which emphasized that "record revenues," "solid financial position" and "international

momentum" underscored the "strongest year" in the Company's history.  The press release

further stated as follows:

> The Company recorded its highest quarterly revenue ever during
> the fourth quarter of 2003. Revenue for the quarter ended
> December 31, 2003 was $3.7 million, a 43% increase over the
> fourth quarter of 2002 and a 38% increase over the third quarter of
> 2003. Total revenue for the full year 2003 increased 10% to $11.0
> million, compared to $10.0 million for 2002. These year-end
> results include the highest levels of both product and consulting

services revenues in the Company's history. The Company's net loss for the fourth quarter of 2003 was $5.3 million compared to a loss of $4.0 million in the comparable quarter of the prior year. The net loss for the entire year ended December 31, 2003 was $18.6 million compared to a loss of $26.6 million for 2002. At December 31, 2003, the Company had no long-term debt, cash of $9.5 million and stockholders' equity of $15.9 million. "The management and staff at Xybernaut have never been more focused," said Edward G. Newman, chairman and CEO of Xybernaut. ..."[M]anagement continues to be optimistic and encouraged by the prospects for 2004 and beyond."

60.     That same day (*i.e.*, March 9, 2004), the trading volume was over 7 million shares, more than twice that of the previous day. The Company's share price traded as high as $1.78 per share, before closing down at $1.58 per share.

61.     On March 12, 2004, the Company filed its financial results for the fourth quarter and fiscal year 2003 with the SEC on Form 10-K (the "2003 10-K"), which was signed by the Individual Defendants. It reiterated the financial information contained in the March 9th press release. The Sarbanes-Oxley Certifications were executed by the Individual Defendants. The 2003 10-K also included a report from Grant Thornton, which stated that it had audited Xybernaut's financial records as of December 31, 2003 and 2002 "in accordance with auditing standards generally accepted in the United States of America," and, as a result, it was able to opine that the financial information "present fairly, in all material respects, the financial position of Xybernaut Corporation as of December 31, 2003 and 2002, and the results of its operations and its cash flows for the three years then ended in conformity with accounting principles generally accepted in the United States of America."

62.     On May 4, 2004, Xybernaut announced its financial results for the first quarter of fiscal year 2004, ended March 31, 2004. The press release stated that "total revenue for the first

quarter ... was $4.4 million, a 146% increase over the comparable 2003 period." The press

release continued as follows:

> This represents the Company's second consecutive quarter of
> record revenue. Last quarter, the period ended December 31, 2003,
> the Company reported revenue of $3.7 million, a 43% increase in
> revenue over the fourth quarter of 2002. As of the end of the first
> quarter 2004, the Company had no long-term debt, cash of $12.5
> million and record stockholders' equity of $18.3 million.
>
> "We are pleased to announce back-to-back quarters with record
> revenue and strong year-to-year revenue growth," said Edward G.
> Newman, chairman and CEO of Xybernaut. ... "With low
> expenses and our losses decreasing, I continue to remain optimistic
> and positive about our prospects for the remainder of 2004 and
> thereafter," continued Newman.

63.    Trading in the Company's stock that day exceeded 3.5 million shares. The share

price closed at $1.26 per share, a decline of $0.02 from the opening price.

64.    On May 7, 2004, the Company filed its financial results for the first quarter of

fiscal year 2004 with the SEC on Form 10-Q, which was signed by the Individual Defendants. It

reiterated the financial information contained in the May 4th press release. The Sarbanes-Oxley

Certifications were also executed by the Individual Defendants. Upon information and belief, in

accordance with Rule 10-01(d) of Regulation S-X (codified at 17 C.F.R. § 210.10-01(d)), Grant

Thornton performed a review of these financial statements before they were filed with the SEC.

65.    On June 28, 2004, Xybernaut announced that it had been included into the Russell

3000 index and the small-cap Russell 2000 index. E. Newman was quoted as follows: "Being

recognized for inclusion in the Russell 3000 and 2000 Indexes marks a significant milestone in

our efforts to refocus the Company and also affords us the opportunity to build an even larger

institutional following for Xybernaut common stock."

-24-

66.     On August 5, 2004, Xybernaut announced its financial results for the second

quarter of fiscal year 2004, ended June 30, 2004.  The Company's press release stated that

"[t]otal revenue for the second quarter of 2004 was $3.4 million, a 21% increase from the

comparable 2003 period [and] [t]otal revenue for the six months ended June 30, 2004 was $7.8

million, a 70% increase" from the same period in 2003.  E. Newman was quoted as stating that

"[w]ith revenues up 70%, the value of our intellectual property now being validated and having

just come off the Company's strongest three quarters ever, I am confident that we are not only on

the right track but also that our growth in many areas will now be sharply accelerating as we

move forward."  The price per share of the Company's stock closed at $1.30, down $0.05 from

the opening.  Volume was just under 1.5 million.

67.     On August 6, 2004, the Company filed its financial results for the second quarter

of fiscal year 2004 with the SEC on Form 10-Q, which was signed by the Individual Defendants.

It reiterated the financial information contained in the August 5th press release.  The Sarbanes-

Oxley Certifications were also executed by the Individual Defendants.  Upon information and

belief, in accordance with Rule 10-01(d) of Regulation S-X (codified at 17 C.F.R. § 210.10-

01(d)), Grant Thornton performed a review of these financial statements before they were filed

with the SEC.

68.     In a press release issued by the Company on October 27, 2004, S. Newman was

quoted as stating that "[i]n less than two weeks at our Q3 conference call, you can expect

confirmation that Xybernaut is on pace to achieve a record revenue year, while also having the

most robust and qualitatively compelling sales contracts in its history."  S. Newman was further

quoted as stating, *inter alia*, the following:

-25-

> We feel it is also important to understand that the very nature of
> how Xybernaut operates has dramatically changed over the past 12-
> 18 months. Xybernaut no longer finds itself expending valuable
> time, effort and resources on building a case for mobile/wearable
> computing in the world-at-large. On the contrary, we are
> experiencing a true global awakening that is creating broad and
> sweeping demand for Xybernaut systems, solutions, our
> technological expertise and our understanding of the unique and
> specialized needs of a wide range of real-world applications.

69.    The next day, on October 28, 2004, Xybernaut issued a press release announcing

the replacement of Davis as the Company's CFO by Bruce C. Hayden ("Hayden"), who is both a

Certified Public Accountant and a Certified Internal Auditor.  The October 28th press release

further stated that Davis would "continue with Xybernaut through November 17, 2004 at which

time he will be assuming the CFO position at a private company headquartered in Washington,

DC."

70.    On November 1, 2004, Xybernaut issued a press release regarding the re-

alignment of the Company's Board, which was intended to "enhance [its] independence ... while

reflecting the Company's commitment to good corporate governance practices."  Specifically, the

Company announced that Kazuyuki Toyosato would not stand for re-election and that long-time

Board member Eugene J. Amobi had resigned.  The press release further stated as follows:

> "Both Kaz and Eugene have contributed greatly to our efforts to-
> date and, working closely with Xybernaut management, made their
> decisions to support the Company's efforts to strengthen its
> balance of internal-independent directors," stated Edward G.
> Newman, Xybernaut chairman and CEO. "Stronger corporate
> governance was a clear objective for the Company and we are
> pleased to be able to share with our investors our continued
> commitment to high standards of corporate governance. ... The
> additions of General Tuttle, Ambassador Ginsburg, Dr. Merten and
> Mr. Yamaoka have contributed greatly to our efforts on this front.
> We firmly believe that maintaining a strong and properly balanced

-26-

Board of Directors is in the best interest of our Company and our stakeholders at all levels and we look forward to setting and accomplishing many meaningful goals," added Newman.

71.    On November 9, 2004, Xybernaut announced its financial results for the third quarter of fiscal year 2004, ended September 30, 2004.  According to the Company's press release, "[t]otal revenue for the third quarter of 2004 was $3.2 million, a 20% increase from the comparable 2003 period [and] [t]otal revenue for the nine months ended September 30, 2004 was $11.0 million, a 51% increase from the nine months ended September 30, 2003." E. Newman was quoted as follows: "We are well on our way to our most successful year ever. ... This top-line growth is the direct result of our continued and successful efforts to bring in new and larger customers while still maintaining our focus on existing partners. ... I firmly believe that we are poised to continue to deliver positive results through the rest of 2004, 2005 and beyond."

72.    On this news, the price per share of Xybernaut stock traded as high as $1.23, before closing at $1.14.  Volume exceeded 4 million shares.

73.    The Company filed its financial results for the third quarter of fiscal year 2004 with the SEC on Form 10-Q, which was signed by the Individual Defendants, that same day.  It reiterated the financial information contained in the November 9th press release.  The Sarbanes-Oxley Certifications were also executed by the Individual Defendants.  Upon information and belief, in accordance with Rule 10-01(d) of Regulation S-X (codified at 17 C.F.R. § 210.10-01(d)), Grant Thornton performed a review of these financial statements before they were filed with the SEC.

74.    On December 16, 2004, with the Company's stock trading as high as $1.40 per share, Xybernaut issued a press release regarding its annual shareholders meeting.  The press

release quoted E. Newman as follows: "2004 continues to be a banner year for the company as we anticipate continued success moving forward. Our efforts remain focused on enhancing both near and long-term shareholder value."

## THE TRUTH BEGINS TO EMERGE

75.    Starting on February 15, 2005, trading prices for Xybernaut common stock began to decline. That day, the share price closed below $1.00 for the first time since September, 2003. The next day, February 16, 2005, trading was unusually heavy – over 8 million shares – and the share price never reached $1.00 a share. On February 17, 2005, Xybernaut issued a press release regarding the drop in the trading price of the Company's shares, and stated "that it knows of no business reason or financial condition that would explain the decline in its stock price." The volume of trading activity lessened on this news, but the share price still declined, closing at $0.92 per share.

76.    On March 14, 2005, however, Xybernaut then announced that it was seeking an extension of time within which to file its annual report with the SEC. The press release stated that the Company "expects to complete and file its Annual Report on Form 10-K by the March 31, 2005 extension date."

77.    On March 31, 2005, after the close of trading, Xybernaut belatedly revealed that it was in dire financial and regulatory straits. The Company issued a press release that day, which stated as follows:

> Xybernaut Corporation (NASDAQ:XYBR) announced today that the filing of its Form 10-K and other related reports for the year ended December 31, 2004, anticipated to occur today, will be further delayed, pending completion of an internal investigation undertaken by its Audit Committee. On February 28th, the Audit

Committee engaged independent counsel - Alston & Bird LLP - to assist it in conducting an **internal investigation of,** among other things, concerns brought to the Audit Committee's attention relating to **the internal control environment of the Company, the propriety of certain expenditures and the documentation of certain expenses of the Chairman and CEO of the Company, the Company's transparency and public disclosure process, the accuracy of certain public disclosures, management's conduct in response to the investigation, and the propriety of certain major transactions.** The Audit Committee's investigation is continuing, and the filing of the Company's 10-K will await the conclusions of that investigation. At this time, the Company is unable to predict when its 10-K will be filed.

On February 1, 2005, the Company received a subpoena from the Northeast Regional Office of the Securities and Exchange Commission, seeking documents and other information relating to the sale of Company securities by any person identified as a selling shareholder in any Company registration statement or other public filing.

As a result of the delayed filing of its Form 10-K, the Company will lose its status to file registration statements on form S-3, which has historically been utilized to expedite the registration of common stock issued in connection with the Company's financings. The loss of the right to use form S-3 could have a material impact on the ability of the Company to raise additional funds in the future, and therefore affect its ability to meet its obligations as they come due.

Management is still in [the] process of completing the Sarbanes-Oxley 404 internal control testing for the year ended December 31, 2004. However, certain material weaknesses currently have been identified related to the control environment and control activities as it relates to the Company's policies and procedures in the expense reimbursement process, revenue recognition related to certain product sales, and monitoring of business risks. Management continues to evaluate the identified issues and is addressing remediation plans to be implemented.

Xybernaut also announced unaudited results for the year end December 31, 2004 in addition to 4th quarter results. Revenues for 2004 were approximately $13.9 million, with a net loss of

approximately $19.7 million. Revenues for the 4th quarter were approximately $2.9 million, with a net loss of approximately $7.2 million. These unaudited results do not include possible further adjustments, including but not limited to, the matters discussed above.

On March 30, 2005 the Company received notice from the NASDAQ Stock Market that the bid price of the Company's common stock has closed below the minimum $1.00 per share requirement for the stock's continued listing under Marketplace Rule 4310(c)(4) (the "Rule"). Therefore, the Company has until September 26, 2005 to become compliant. (Emphasis added.)

78.    On this news, the Company's share price was decimated. After closing at $0.42 per share the previous day, on April 1, 2005, the price per share dropped almost by half, to close at $0.24. Over 33 million shares were traded, which was the highest volume in over a year.

79.    On April 8, 2005, after the close of trading, Xybernaut announced that investors could not rely on any of its financial statements for the entire Class Period. Specifically, the press release stated as follows:

Xybernaut® Corporation (NASDAQ:XYBRE) announced today that **investors and others should refrain from relying upon the Company's historical financial statements**, together with the related audit reports the Company received from its outside auditors, Grant Thornton LLP, **for the years ended December 31, 2002 and 2003, and interim quarterly reports for the quarters ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004.** The Company's action was taken in response to a letter which the Company received from Grant Thornton LLP, on April 6, 2005, indicating that the nature of the items disclosed by the Company in its Form 8-K filed on April 1, 2005, and the uncertainties surrounding the results of the ongoing Audit Committee investigation disclosed in such Form 8-K, have caused the firm to question the accuracy and reliability of the Company's accounting and related disclosures provided in the specified prior period financial statements. The Audit Committee has reviewed the Company's disclosure in this press release and in the Company's

related Form 8-K with Grant Thornton LLP.

Upon completion of the Audit Committee's investigation, the Company intends promptly to implement any recommendations resulting from the Audit Committee's investigation and to take any other actions necessary to satisfy the concerns raised by Grant Thornton LLP. The Company has retained Kalorama Partners, LLC, a consulting firm founded by former SEC Chairman Harvey Pitt, to assist the Company in fulfilling these commitments. The Company also announced today that on April 5, 2005, it received notice from The Nasdaq Stock Market of Nasdaq's intent to delist the Company's securities at the opening of business on April 14, 2005, subject to the Company's right to request a hearing with the Nasdaq Listing Qualifications Panel in accordance with the Marketplace Rule 4800 Series. In the notice, Nasdaq asserted that the Company is in violation of Nasdaq Marketplace Rule 4310(c)(14) because, as the Company previously announced, it has not yet filed its Annual Report on Form 10-K with Nasdaq and the SEC. (Emphasis added.)

80.     On this news, trading was again heavy. Volume on April 11, 2005 was over 15 million shares. The Company's price per share, which had opened at $0.14 – down $0.05 per share from the previous trading day's close – ended the day at $0.13 per share.

81.     As disclosed by Xybernaut in paragraphs 77 and 79, the Defendants' statements regarding Xybernaut's financial conditions, as set forth in the foregoing paragraphs (including paragraphs 22-24, 26, 29-30, 33, 35-37, 39, 43, 45, 47, 49, 51, 54-55, 57-59, 61-62, 64, 66-68, 71, and 73-75), were false and misleading when issued and Defendants either directly issued these statements or acquiesced to these misrepresentations by sitting idly by while they were in possession of material information that specifically contradicted these representations.

## POST-CLASS PERIOD REVELATIONS

82.     On April 19, 2005, Xybernaut issued a press release announcing, *inter alia*, the results of its Audit Committee investigation and the steps the Company had taken in response to

those findings. In part, the press release stated:

> 1. The Company's Chairman and CEO, Edward G. Newman, improperly used substantial Company funds for personal expenses and failed properly to substantiate expenses charged to the Company.

> 2. Members of the CEO's family employed by the Company were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.

> 3. The employment of certain members of the CEO's family was not disclosed in SEC filings as required by SEC disclosure regulations.

> 4. There has been a lack of adherence to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.

> 5. Major transactions were entered into by certain members of senior management in violation of Company internal controls. Certain members of senior management failed properly to advise the Board of material financial conditions regarding major transactions.

> 6. Certain members of senior management failed to disclose to the Audit Committee and the Board written correspondence by the Company's former Chief Financial Officer outlining serious concerns over the breakdown of internal controls; and

> 7. Edward G. Newman and Steven A. Newman affirmatively impeded the Audit Committee's investigation in material respects.

> In response to the Audit Committee's Report and Recommendations, the Board today approved the following actions:

> 1. Edward G. Newman was removed as Chairman of the Board and Chief Executive Officer of the Company, and from all other positions he holds with any Company subsidiaries or affiliates.

> 2. Steven A. Newman was removed as President and Chief

Operating Officer of the Company, and Vice Chairman of the
Board, and from all other positions he holds with any Company
subsidiaries or affiliates.

3. The Board formally requested the resignations of Edward G. and
Steven A. Newman as Directors of the Company, but neither
individual has agreed to resign from the Board at this time.

4. Retired General William Tuttle was appointed as the Company's
Interim Chairman of the Board and Chief Executive Officer, while
a search is conducted for new management.

5. The Board authorized the retention of financial experts to assist
the Board in maximizing shareholder value.

6. In an effort to promote the independence of the Company's
Board, three directors of the Company - James J. Ralabate, Dr.
Edwin Vogt and Martin Weisberg, each of whom provides other
services for the Company - offered to resign from the Board. The
Board determined to defer its acceptance of these offers upon an
orderly transition to a new Board.

83.    In addition, as to Grant Thornton, the Company's April 19th press release provided

as follows:

The Company also announced that Grant Thornton LLP has
resigned as the Company's independent auditors. The Company
received a letter from Grant Thornton LLP on April 14, 2005,
stating that Grant Thornton LLP has concluded that, in its
professional judgment, it can no longer rely on management's
representations and has resigned as the Company's registered
independent accounting firm. On April 8, 2005, the Company
advised investors and others that, based upon a letter the Company
received from Grant Thornton LLP on April 6, 2005, no reliance
should be placed upon certain of the Company's historical
financial statements, together with the related audit reports the
Company received from its outside auditors. In light of Grant
Thornton LLP's resignation, the Company advises investors and
others to continue to refrain from relying upon any of the
Company's historical financial statements, together with the related
audit reports the Company received from its outside auditors, Grant
Thornton LLP.

-33-

The reports of Grant Thornton LLP on the Company's financial statements for the 2002 and 2003 fiscal years did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles. In addition, in connection with the audits of the Company's financial statements for fiscal years 2002 and 2003, and in the subsequent interim periods, there were no disagreements between the Company and Grant Thornton LLP on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure which, if not resolved to the satisfaction of Grant Thornton LLP, would have caused Grant Thornton LLP to make reference to the matter in connection with its report.

However, as noted above, Grant Thornton LLP has now concluded that, in its professional judgment, it can no longer rely on management's representations. After Grant Thornton LLP was advised of the results of the Audit Committee investigation, Grant Thornton LLP advised the Audit Committee's counsel that certain members of senior management failed to disclose facts material to the financial statements and the weaknesses in the internal controls. The Audit Committee has discussed the basis for Grant Thornton LLP's conclusion with Grant Thornton LLP and has authorized Grant Thornton LLP to respond fully to the inquiries of any successor accountant concerning this subject. The Audit Committee has reviewed the Company's disclosure in this press release and in the Company's related Form 8-K with Grant Thornton LLP.

In light of Grant Thornton LLP's resignation as the Company's independent auditor and the other matters discussed above, the Company is unable to predict when new auditors will be selected and its Form 10-K will be filed.

84.     In the April 22, 2005 edition of Newsday, it was reported that a federal grand jury indictment, which had been handed down in July, 2004, and ordered unsealed by the United States District Court for the Eastern District of New York in December, charged that John Marciano ("Marciano"), the former Chairman and Chief Executive of Royce Investment Group Inc. ("Royce") (which underwrote Xybernaut's 1996 IPO), together with two others, had

orchestrated a "pump and dump" stock manipulation scheme involving Xybernaut stock that cheated investors out of $16.8 million. The indictment, filed in <u>United States of America v. John Marciano, et al.</u>, No. CR 04-667 (LDW) (collectively, the "Indictment"), alleges that in November 1995 (prior to Xybernaut's IPO), Marciano and his co-defendants obtained a large block of the Company's convertible notes, through the use of "Front corporations" based in the Cayman Islands and elsewhere. Following the Xybernaut IPO, the notes were converted into units, each of which was comprised of one share of common stock and one warrant. The Indictment further alleges that between July 1996 and January 1997, retail brokers at Royce and Kensington Wells manufactured an "artificial market demand" to inflate the price of the Company's securities, which they then induced their clients to purchase through "deceptive acts and manipulative means." With Xybernaut trading at an inflated price, it is alleged that Marciano and his co-defendants then sold their holdings at a substantial profit. The proceeds were then laundered through the Front corporations and distributed to Marciano and his co-defendants as recently as April 2004.

85.    The Indictment does not name Xybernaut or any of its officers or directors as co-defendants. However, the Indictment does detail the purchase of over $2 million of the Company's convertible notes between November 16, 1995 and April 16, 1996 by six of the Front corporations, which represented a significant introduction of capital to the Company at the time.

86.    In a press release issued on April 25, 2005, Xybernaut announced that it had been notified on April 22, 2005 that the U. S. Attorney's Office for the Eastern District of Virginia had opened an investigation. The press release did not identify the target or the basis of the investigation. In addition, the Company said it "continues to face a severe liquidity crisis and

-35-