possible insolvency" and that it could not assure that it would have "sufficient cash to meet its financial obligations or fund continuing operations."

87.    Moreover, the April 25th press release announced that, after less than a week, William Tuttle had resigned as the Company's interim Chairman and CEO. In his place, Tuttle and two other outside directors, Harry E. Soyster and Marc Ginsberg, would serve as co-chairmen in a newly-created "Office of the Chairman of the Board."

88.    On April 28, 2005, the Company filed a current report with the SEC on Form 8-K, in which it again reiterated that investors should not rely on "previously-issued financial statements or a related audit report." Furthermore, the Form 8-K stated as follows:

> At this time, the Company is in the process of seeking to engage a new accounting firm to perform an audit of its financial statements for the fiscal year ended December 31, 2004. Upon the Company's engagement of an new accounting firm, the Company will work diligently with such new accounting firm to file its Form 10-K for such period as soon as practicable thereafter. At this time, the Company can not predict when such filing will be made. The new accounting firm which the Company engages will also be instructed by the Company to perform re-audits of the Company's financial statements for the fiscal years ended December 31, 2002 and 2003, and perform reviews, in accordance with applicable accounting standards, of the interim periods for the quarters ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004. Upon the conclusion of such re-audits and reviews, the Company shall file, as may be required, any amended Form 10-K and Form 10-Q for such periods.

89.    On May 2, 2005, Xybernaut issued a press release in which it was announced that on April 26, 2005, it had received another letter from the Nasdaq staff providing additional grounds for de-listing of the Company's stock. The press release identified the areas of Nasdaq's grounds to be (1) "[i]nvestors are currently unable to determine the current or historical financial

status of the Company or whether the Company will be able to continue as a going concern;" (2)
"[s]ince the Company currently has no outside auditors, it is impossible to predict when accurate
financial statements can be released;" (3) "[i]nvestors currently do not know the complete extent
of the Company's internal control failures, or whether appropriate remedial measures have been
taken;" and (4) "[n]either Edward G. Newman nor Steven S. Newman resigned their Director
positions despite a request by the Board that they do so." The press release stated that these
issues, as well as Xybernaut's failure to timely file its Annual report on Form 10-K with the SEC
and the fact that the bid price of the Company's common stock had closed below the Nasdaq's
minimum of $1.00 per share, would be the subject at a hearing before a Nasdaq Listing
Qualifications Panel to be held on May 5, 2005.

90.    In a press release issued by Xybernaut on May 9, 2005, it was announced that
separate letters from counsel for S. Newman and E. Newman had been received by the Company
which stated that both resigned as directors, effective May 3 and May 4, 2005.

91.    On May 11, 2005, Xybernaut filed a notification of its inability to timely file a
Form 10-Q with the SEC. Therein, the Company stated that it "has not engaged a new
accounting firm to perform auditing services; however, the Audit Committee is considering
engaging a new accounting firm to perform auditing services." Moreover, the Company
indicated that it anticipated a "significant change in results of operations from the corresponding
period for the last fiscal year."

92.    The next day, after the market had closed, Xybernaut issued a press release in
which it announced what investors had known since earlier that day – the Company's common
stock was de-listed from Nasdaq. According to the press release, the Company had been

informed by Nasdaq that the de-listing would be effective with the open of the market on Friday,

May 13, 2005, but, in fact, that had occurred a day earlier. In addition, the press release

commented on the May 5, 2005 hearing before the Nasdaq Listing Qualifications Panel as

follows:

> The Panel determined that the continued listing of the Company's
> common stock on the Nasdaq SmallCap Market would not serve
> Nasdaq's goals of preserving and strengthening the quality of and
> public confidence in its market, in addition to the Company not
> being in a position to provide appropriate disclosure to the
> investing public within a reasonable period of time, noting the
> following:
>
>> The lack of reliable financial data available to the
>> public about the Company extends back to the fiscal
>> year ended December 31, 2002;
>>
>> The Company cannot predict the amount of time it
>> will take to provide reliable historical or current
>> financial information;
>>
>> The Company needs to continue to pursue and hire
>> new auditors;
>>
>> The Board of Directors and senior management
>> staff needs to be rebuilt; and
>>
>> The Company's cash resources are scarce for these
>> rebuilding efforts.
>
> The Company does not presently intend to appeal the decision to
> delist its securities.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil

Procedure, on behalf of himself and all other persons who purchased or otherwise acquired

Xybernaut common stock and/or other securities during the Class Period (*i.e.*, between May 10,

2002 and April 8, 2005, inclusive). Excluded from the Class are Xybernaut, its subsidiaries and affiliates, the Individual Defendants, members of the immediate families of each of the Individual Defendants, any entities in which any of the Defendants have a controlling interest, and the legal representatives, heirs, successors, predecessors in interest, affiliates or assigns of any of the Defendants.

94.    This action may properly be maintained as a class action as a result of the following facts:

a.    During the Class Period, hundreds of thousands of shares of Xybernaut's common stock were issued and outstanding and were actively traded on the Nasdaq, a liquid, efficient and impersonal trading market. The members of the Class for whose benefit this action is brought are located throughout the United States, and are so numerous that joinder of all members of the putative Class is impracticable. Hundreds of thousands of Xybernaut shares were publicly traded during the Class Period and, upon information and belief, there are hundreds or thousands of members of the Class;

b.    Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff and all members of the Class sustained damages as a result of the Defendants' wrongful conduct complained of herein;

c.    Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class he seeks to represent;

d.    A class action is superior to all other available methods for the fair and

-39-

efficient adjudication of the claims asserted herein, because joinder of all members is

impracticable. Furthermore, because the damages suffered by the individual Class members may

be relatively small, the expense and burden of individual litigation make it virtually impossible

for the Class members to separately redress the wrongs done to them. The likelihood of

individual Class members prosecuting separate claims is remote;

        e.      Plaintiff anticipates no unusual difficulties in the management of this

action as a class action; and

        f.      The questions of law and fact common to the members of the Class

predominate over any questions affecting any individual members of the Class.

    95.    The questions of law and fact which are common to the Class include, among

others:

        a.      Whether the federal securities laws were violated by the Defendants' acts

as alleged in this Complaint;

        b.      Whether the documents, press releases, reports and/or statements

disseminated to the investing public and to Xybernaut shareholders during the Class Period

omitted or misrepresented material facts about the financial condition, business prospects, and

revenue expectations of Xybernaut;

        c.      Whether Defendants failed to correct previously issued statements that

they knew to be false or they recklessly disregarded the truth or falsity of such statements;

        d.      Whether Defendants failed to disclose material, adverse information at a

time when they were in possession of such information;

        e.      Whether the Defendants acted with knowledge or reckless disregard for

the truth in misrepresenting and omitting material facts;

       f.    Whether, during the Class Period, the market price of Xybernaut common stock and other securities was artificially inflated due to the material misrepresentations and omissions complained of herein;

       g.    Whether the Defendants participated in and pursued the common course of conduct complained of herein; and

       h.    Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

## FRAUD-ON-THE-MARKET DOCTRINE

96.    Plaintiff relies, in part, upon the presumption of reliance established by the fraud-on-market doctrine. The market for Xybernaut common stock was, at all pertinent times, a liquid and efficient market for, *inter alia*, the following reasons:

       a.    Xybernaut met the requirements for listing, and was listed on the Nasdaq, a highly efficient and liquid market;

       b.    As a regulated issuer, Xybernaut filed periodic public reports with the SEC;

       c.    Xybernaut's securities trading volume was substantial during the Class Period;

       d.    Xybernaut was covered by various securities analysts, who wrote reports which were available through various automated data retrieval services;

       e.    Xybernaut disseminated information on a market-wide basis through various electronic media services, and participated in open conference calls with stock analysts

-41-

and investors; and

        f.     The market price of Xybernaut securities reacted rapidly to new information entering the market.

97.     The facts identified above reflect the existence of an efficient market for trading of Xybernaut securities and make applicable the fraud-on-the-market doctrine. Similarly, Plaintiff and the other members of the Class are entitled to a presumption of reliance with respect to the misstatements and omissions alleged in this Complaint.

### DEFENDANTS' DUTIES AND MISCONDUCT

98.     As officers, directors and/or controlling persons of a publicly-held company whose common stock is registered with the SEC under the Exchange Act, traded on the Nasdaq at all pertinent times, and governed by the provisions of the Exchange Act, the Individual Defendants had a duty to disseminate accurate and truthful information in a timely manner with respect to Xybernaut's operations, finances, financial condition, revenues, income, earnings and present and future business prospects, to correct any previously issued statements from any source that had become untrue, and to disclose any trends that would materially affect earnings and the present and future financial operating results of Xybernaut, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

99.     During the Class Period, each of the Individual Defendants was a senior executive and/or director of the Company and was privy to confidential and proprietary information concerning Xybernaut, its operations, finances, financial condition, revenues, income, earnings and present and future business prospects and regularly received reports regarding the same. As a result of their possession of such information, each of the Individual Defendants knew or

-42-

recklessly disregarded the fact that Xybernaut had materially overstated the quality of its financial condition during the Class Period and had not disclosed critical information to the investing public which would have revealed that the Company's prior statements were materially misleading and false. As a result of their Board memberships and/or executive and managerial positions with Xybernaut, each of the Individual Defendants had access to adverse non-public information about the Company's operations, finances, financial condition, products, revenues, expenses and earnings via access to internal corporate documents, conversations and connections with other corporate officers and employees, and via reports and other information provided to them in connection with the performance of their duties. In light of their possession of such information, each of the Individual Defendants knew or recklessly disregarded the fact that the reported and expected financial results of Xybernaut were materially overstated during the Class Period.

100.    The Individual Defendants, as a result of their positions of control and authority as officers and/or directors of the Company, were able to and did control the contents of the various quarterly reports, SEC filings, press releases and presentations to securities analysts pertaining to the Company. Each of the Individual Defendants was provided with copies of Xybernaut's management reports, press releases and SEC filings alleged in this Complaint to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. As a result, each of the Individual Defendants is responsible for the accuracy of the challenged public reports and releases as "group published" information and is, therefore, responsible and liable for the representations contained in those statements.

-43-

101.    Each of the Individual Defendants is liable as a direct participant in, and a co-conspirator with respect to, the wrongs complained of in this Complaint. In addition, the Individual Defendants, by reason of their status as officers and/or directors of Xybernaut, had access to material, non-public information, were "controlling persons" within the meaning of Section 20 of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of in this Complaint. As a result of their positions of control, each of the Individual Defendants were able to and did, directly or indirectly, control the conduct of Xybernaut's business, the information contained in its filings with the SEC and public statements about its business.

102.    During the Class Period, Defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to misrepresent the results of Xybernaut's operations, and to conceal adverse material information regarding the financial condition and results Xybernaut's operations as specified in this Complaint. Defendants employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and the course of conduct described herein in an effort to increase and maintain an artificially high market price for Xybernaut common stock and other securities. This included the formulation, making and/or participation in the making of untrue statements of material facts, and the failure to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, which operated as a fraud and deceit upon Plaintiff and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

103.    As alleged herein, Defendants acted with scienter in that they knew that the

-44-

public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Xybernaut, their control over, and/or receipt and/or modification of Xybernaut's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Xybernaut, participated in the fraudulent scheme alleged herein. In addition, Defendants were motivated to engage in the fraudulent scheme to complete at least $25.85 million in private placements of Company stock and warrants, and long-term borrowing.

### DEFENDANTS' FINANCIAL STATEMENTS DURING THE CLASS PERIOD WERE MATERIALLY FALSE AND MISLEADING AND VIOLATED GAAP

104.    At all relevant times during the Class Period, Defendants represented that Xybernaut's financial statements when issued were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. However, in order to artificially inflate the price of Xybernaut's stock, Defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate its revenues and other financial information during the Class Period.

105.    Xybernaut's materially false and misleading Financial Statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding

Xybernaut's actual operating results. Specifically, as discussed herein, Defendants caused the

Company to violate GAAP by (1) improperly accounting for revenue related to certain product

sales; (2) improperly accounting for expense reimbursements; and (3) failing to disclose and

properly account for related party transactions in accordance with GAAP and SEC rules.

106.    Grant Thornton issued unqualified audit opinions for its annual audits of

Xybernaut's 2002 and 2003 financial statements. These unqualified reports were included in

Xybernaut's 2002 10-K and 2003 10-K. In addition, Grant Thornton performed a review of

Xybernaut's interim financial statements before they were filed with the SEC on Forms 10-Q

during the Class Period. As alleged herein, Xybernaut's financial statements were false and

violated GAAP. Therefore, pursuant to applicable SEC regulations, Xybernaut's financial

statements issued during the Class period are presumed to be misleading.

107.    GAAP are those principles recognized by the accounting profession as the

conventions, rules and procedures necessary to define accepted accounting practices at a

particular time. As set forth in Financial Accounting Standards Board ("FASB") Statements of

Concepts ("CON") No. 1, one of the fundamental objectives of financial reporting is that it

provide accurate and reliable information concerning an entity's financial performance during the

period being presented. CON No. 1, paragraph 42, states:

> Financial reporting should provide information about an
> enterprise's financial performance during a period. Investors and
> creditors often use information about the past to help in assessing
> the prospects of an enterprise. Thus, although investment and
> credit decisions reflect investors' and creditors' expectations about
> future enterprise performance, those expectations are commonly
> based at least partly on evaluation of past enterprise performance.

108.    As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements

filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be

misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).  Management is responsible for preparing

financial statements that conform with GAAP.  As noted by the AICPA professional standards:

> financial statements are management's responsibility . . . .
> [M]anagement is responsible for adopting sound accounting
> policies and for establishing and maintaining internal control that
> will, among other things, record, process, summarize, and report
> transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements.
> The entity's transactions and the related assets, liabilities and
> equity are within the direct knowledge and control of management
> . . . .  Thus, the fair presentation of financial statement in
> conformity with Generally Accepted Accounting Principles is an
> implicit and integral part of management's responsibility.

### Xybernaut's Improper Failure To Disclose Material Related Party Transactions

109.    In FASB's Statement of Financial Accounting Standard ("SFAS") No. 57, *Related*

*Party Disclosures* (March 1982), GAAP provides guidance on disclosures of transactions

between related parties.[1]  SFAS No. 57 states that an "enterprise's financial statements may not

be complete without additional explanations of and information about related party transactions

and thus may not be reliable."  Accordingly, SFAS No. 57 requires that financial statements

identify material related party transactions and disclose (a) the "nature of the relationship(s)," (b)

a "description of the transactions," (c) the "dollar amount of transactions for each period for

which an income statement is presented," and (d) the "[A]mounts due from or to the related

---

[1]Pursuant to SFAS No. 57, related party transactions include transactions between an
enterprise and its Directors, CEO, COO, Vice Presidents in charge of principal business
functions, and other persons who perform similar policy-making functions.

-47-

parties as of the date of each balance sheet."[2]

110.    In addition, as noted in the SEC's SAB Topic 4E, GAAP provides that:

> [I]n some cases, the significance of an amount may be independent of the amount involved. For example, amounts due to and from officers and directors, because of their special nature and origin, ought generally to be set forth separately [in financial statements] even though the dollar amounts involved are relatively small.

111.    As Xybernaut has now admitted, during the Class Period, it engaged in numerous material related party and self-dealing transactions that were not disclosed in its financial statements in violation of GAAP, including E. Newman's improper use of substantial Company funds for personal expenses and failure to properly substantiate expenses charged to the Company, and major transactions entered into by certain members of senior management in violation of Company internal controls and their failure to properly advise the Board of material financial conditions regarding these transactions.

112.    Moreover, GAAP, in APB Opinion No. 22, *Disclosure of Accounting Policies* ¶ 7 (April 1972), provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company. In fact, GAAP states that information about the accounting policies adopted by a reporting company is "essential" for financial statements users. *Id.* ¶ 8. Accordingly, GAAP, in paragraph 12 of APB Opinion No. 22, provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and

---

[2]Pursuant to SFAS No. 57, disclosure of compensation arrangements that are not in the ordinary course is necessary for users to understand financial statements.

methods that involve any of the following:

a.     A selection from existing acceptable alternatives;

b.     Principles and methods peculiar to the industry in which the reporting
       entity operates, even if such principles and methods are predominantly
       followed in that industry;

c.     Unusual or innovative applications of generally accepted accounting
       principles (and, as applicable, of principles and methods peculiar to the
       industry in which the reporting entity operates).

113.    Xybernaut's Class Period financial statements were also false and misleading and
failed to comply with GAAP in that they failed to disclose and identify the improper accounting
of revenue related to certain product sales. Consequently, investors were unable to assess the
appropriateness of, or the risks associated with, Xybernaut's financial reporting.

114.    Xybernaut's failures violated a number of additional GAAP provisions. For
example, GAAP provides that:

a.     financial reporting should provide information that is useful to present and
potential investors and creditors and others in making rational investment, credit and similar
decisions (CON No. 1, ¶ 34);

b.     financial reporting should provide information about the economic
resources of an enterprise, the claims to those resources, and the effects of transactions, events
and circumstances that change resources and claims to those resources (CON No. 1, ¶ 40);

c.     financial reporting should provide information about how management of
an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of
enterprise resources entrusted to it. To the extent that management offers securities of the
enterprise to the public, it voluntarily accepts wider responsibilities for accountability to

-49-

prospective investors and to the public in general (CON No. 1, ¶ 50);

        d.     financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluation of past enterprise performance (CON No. 1, ¶ 42);

        e.     financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (CON No. 2, ¶¶ 58-59);

        f.     financial reporting should be complete, so that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (CON No. 2, ¶ 79); and

        g.     financial reporting should be conservative and ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (CON No. 2, ¶¶ 95, 97).

### Failure To Maintain An Adequate System Of Internal Controls

115.    In addition to the foregoing improper accounting practices, Xybernaut also suffered from a widespread failure of internal accounting controls throughout the Class Period, which rendered its financial reporting inherently suspect and unreliable, and subject to manipulation, resulting in materially false and misleading financial statements.

116.    In this regard, Defendants failed to design and implement an internal control system over the Company's financial reporting processes, allowing Defendants to improperly report revenue related to the sales of certain products, and to engage in improper related party transactions.

117.    Section 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m, states, in pertinent part, that every reporting company must: (A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and disposition of the assets of the issuer; and (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.  These provisions require an issuer such as Xybernaut to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

118.    Xybernaut violated Section 13(b)(2) of the Exchange Act by failing to maintain accurate records concerning its reporting of revenue related to certain product sales, related party transactions entered into by members of the Company's senior management, and reimbursements of expenses.  In addition, Xybernaut violated this section by failing to implement procedures reasonably designed to prevent accounting irregularities.  Xybernaut failed to put into place proper reviews and checks to ensure that its officers and other members of management did not engage in accounting improprieties.  It failed to ensure that transactions were reported in accordance with its own policies and with GAAP.

119.    Xybernaut's lack of adequate internal controls rendered its Class Period financial

-51-

reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP. Nonetheless, throughout the Class Period, the Company regularly issued quarterly and annual financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

## DEFENDANT GRANT THORNTON LLP'S
## PARTICIPATION IN THE FRAUD AND ITS SCIENTER

120.    Defendant, Grant Thornton, through its Vienna, Virginia office, served as Xybernaut's auditor and principal accounting firm during the Class Period. Grant Thornton was required to audit the Company's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS")[3], and to report the audit results to Xybernaut, the Board of Directors, the Audit Committee, and members of the investing public, including Plaintiff and other members of the Class. With knowledge of Xybernaut's true financial condition, or in reckless disregard thereof, Grant Thornton certified the materially false and misleading financial statements of Xybernaut described below, and provided unqualified Independent Auditors' Reports, which were included in the SEC filings and publicly disseminated statements. Without these materially false and misleading unqualified audit opinions, the fraud alleged above could not have been perpetrated.

### Grant Thornton Had Full And Complete Access To Xybernaut's Information

121.    Grant Thornton knew of, or recklessly disregarded, the adverse facts alleged

---

[3]GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), relates to the conduct of the individual audit engagements. Statements on Auditing Standards (codified and referred to as AU § __) are recognized by the AICPA as the interpretation of GAAS.

-52-

herein concerning Xybernaut's improper financial reporting during the Class Period, including
the Company's 2002 10-K and 2003 10-K and its unqualified audit opinions thereon. Grant
Thornton's knowledge, or its reckless disregard, is based upon its relationship with Xybernaut
and the nature of the auditing and other services rendered to the Company, and the fact that Grant
Thornton's personnel were regularly present at Xybernaut and had intimate knowledge of
Xybernaut's financial reporting practices based on its access to confidential internal corporate,
financial, operating and business information. Nonetheless, Grant Thornton knowingly, or
recklessly, issued false unqualified audit opinions during the Class Period.

122.    Grant Thornton violated GAAS Standard of Reporting No. 1, which requires the
audit report to state whether the financial statements are presented in accordance with GAAP.
AU § 508.40. Grant Thornton's opinion falsely represented that Xybernaut's financial
statements contained in the 2002 10-K and 2003 10-K were presented in conformity with GAAP.

123.    The auditor's report must express an opinion on the financial statements taken as
a whole and must contain a clear indication of the character of the auditor's work. The auditor
can determine that he is able to express an unqualified opinion only if he has conducted his audit
in accordance with GAAS. AU § 508.07.

124.    Grant Thornton did not render an accurate audit report and thus did not exercise
due professional care, because Xybernaut's financial statements were not in conformity with
GAAP, and because Grant Thornton failed to perform sufficient procedures to audit Xybernaut's
financial statements as of December 31, 2002 and 2003, in accordance with GAAS.

125.    As alleged herein, Grant Thornton issued its audit opinion in connection with
Xybernaut's 2002 10-K. Grant Thornton's opinion stated that the Company's financial

-53-

statements were presented in conformity with GAAP and that Grant Thornton's audit was

performed in accordance with GAAS:

> We have audited the accompanying consolidated balance sheets of
> Xybernaut Corporation (a Delaware corporation) as of December
> 31, 2002 and 2001, and the related consolidated statements of
> operations, stockholders' equity, and cash flows for the three years
> then ended. These financial statements are the responsibility of the
> Company's management. Our responsibility is to express an
> opinion on these financial statements based on our audits.

> We conducted our audits in accordance with auditing standards
> generally accepted in the United States of America. Those
> standards require that we plan and perform the audit to obtain
> reasonable assurance about whether the financial statements are
> free of material misstatement. An audit includes examining, on a
> test basis, evidence supporting the amounts and disclosures in the
> financial statements. An audit also includes assessing the
> accounting principles used and significant estimates made by
> management, as well as evaluating the overall financial statement
> presentation. We believe that our audits provide a reasonable basis
> for our opinion.

> In our opinion, the financial statements referred to above present
> fairly, in all material respects, the financial position of Xybernaut
> Corporation as of December 31, 2002 and 2001, and the results of
> its operations and its cash flows for the three years then ended in
> conformity with accounting principles generally accepted in the
> United States of America.

126.   As alleged herein, Grant Thornton issued its audit opinion in connection with

Xybernaut's 2003 10-K. Grant Thornton's opinion stated that the Company's financial

statements were presented in conformity with GAAP and that Grant Thornton's audit was

performed in accordance with GAAS:

> We have audited the accompanying consolidated balance sheets of
> Xybernaut Corporation (a Delaware corporation) as of December
> 31, 2003 and 2002, and the related consolidated statements of
> operations, stockholders' equity, and cash flows for the three years

-54-

then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Xybernaut Corporation as of December 31, 2003 and 2002, and the results of its operations and its cash flows for the three years then ended in conformity with accounting principles generally accepted in the United States of America.

127.    In issuing such audit opinions, Grant Thornton turned a blind eye to Xybernaut's improper accounting practices, as described above, and issued unqualified audit opinions on the company's financial statements for the 2002 and 2003 fiscal years, even though Grant Thornton knew or recklessly disregarded that: (a) the financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position of Xybernaut and its subsidiaries as of December 31, 2002 and 2003, and the results of their operations and cash flow for the years ended December 31, 2002 and 2003; and (b) Grant Thornton had not audited Xybernaut's fiscal 2002 and 2003 financial statements in accordance with GAAS.

128.    As alleged herein, Xybernaut's violations of GAAP during the Class Period

-55-

included (i) the improper reporting of revenue relating to certain product sales; (ii) improper accounting of related party transactions entered into by members of the Company's senior management; and (iii) improper accounting of reimbursement of Company expenses.

129.    During the course of Grant Thornton's audits of Xybernaut, "red flags" were present which should have alerted the auditors of their need to obtain additional evidential matter. In conducting an audit, an auditor must obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. AU § 326.01.

130.    During the Class Period, Grant Thornton knew or recklessly disregarded, *inter alia,* "red flags," including the following: (i) the improper use by E. Newman of substantial Company funds for personal expenses and the failure to properly substantiate expenses charged to the Company; (ii) the Company's employment of E. Newman's family members in direct violation of the Company's anti-nepotism policy, and the fact that they then constituted a "protected class" of employees; (iii) the failure to disclose to the SEC the employment by the Company of E. Newman's family members; (iv) the failure of Xybernaut personnel to adhere to effective disclosure controls governing the Company's public disclosures and the issuance of press releases; and (v) the violation of the Company's internal controls in connection with major transactions entered into by certain members of senior management (and the failure of senior management to properly advise the Board of material financial conditions regarding major transactions).

131.    The foregoing "red flags" provided sufficient notice to Grant Thornton that it should reevaluate its risk assessments. GAAS requires that risk assessments should be made

-56-

with consideration of applicable risk factors. *See* AU §§ 316.12, 316.14. The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present." AU § 316.25. One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is an "[i]nadequate monitoring of significant controls." AU § 316.17.

132.    Grant Thornton also failed to comply with Statement on Auditing Standards No. 8, in that it failed to take appropriate action relating to material misstatements contained in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") sections of the 2002 10-K and the 2003 10-K to the extent they discussed revenues, because of the "lack of adherence to effective disclosure controls governing the Company's public disclosures . . . ." *See* AU § 550.

133.    Auditors must exercise due professional care in performing the audit and preparing the audit report. AU § 230.01. Due professional care concerns what the auditor does and how well he does it. AU § 230.04.

134.    Grant Thornton did not exercise due professional care because it failed to obtain sufficient competent evidential matter to support the assertions in Xybernaut's financial statements; maintain an attitude of professional skepticism; and render an accurate audit report on behalf of Xybernaut.

135.    Grant Thornton violated GAAS Standard of Reporting No. 3, which requires that informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report. As alleged herein, Grant Thornton knew that Xybernaut's disclosures were not reasonably adequate, or recklessly disregarded their adequacy.

136.    For example, Grant Thornton ignored the fact that Xybernaut failed to make

adequate disclosures concerning accounting policies relating to the recognition of revenue on the

sales of certain products.  Furthermore, Grant Thornton knew that PwC had previously raised

concerns regarding Xybernaut's "policies and procedures for the recognition of revenue." GAAP

provides that the usefulness of financial statements in making economic decisions depends

significantly upon the user's understanding of the accounting policies followed by a company.

APB Opinion No. 22 ¶ 7.  In fact, GAAP states that information about the accounting policies

adopted by a reporting company is "essential" for financial statement users.  Id. ¶ 8.

Accordingly, GAAP in APB Opinion No. 22 ¶ 12, provides:

> In general, the disclosure should encompass important judgments
> as to appropriateness of principles relating to recognition of
> revenue and allocation of asset costs to current and future periods;
> in particular, it should encompass those accounting principles and
> methods that involve any of the following:
>
> a.    A selection from existing acceptable alternatives;
>
> b.    Principles and methods peculiar to the industry in
>       which the reporting entity operates, even if such
>       principles and methods are predominantly followed
>       in that industry;
>
> c.    Unusual or innovative applications of generally
>       accepted accounting principles (and, as applicable,
>       of principles and methods peculiar to the industry in
>       which the reporting entity operates).

137.    Accordingly, because Xybernaut "omit[ted] from the financial statements,

including the accompanying notes, information that [was] required by generally accepted

accounting principles, [Grant Thornton] should [have] express[ed] a qualified or an adverse

opinion and should [have] provide[d] the information in [their] report." AU § 431.03.

-58-

138.    Grant Thornton violated GAAS Standard of Reporting No. 4 which requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. Grant Thornton should have stated that no opinion could be issued by it on Xybernaut's fiscal 2002 or 2003 financial statements or issued an adverse opinion stating that the fiscal 2002 and 2003 financial statements were not fairly presented.

139.    Grant Thornton violated GAAS General Standard No. 2, which requires that independence in mental attitude is to be maintained by the auditor in all matters related to the assignment.

140.    Grant Thornton violated SAS No. 82, in that it failed to adequately consider the risk that the audit financial statements of Xybernaut were free from material misstatement, whether caused by errors or fraud. Grant Thornton knew or recklessly ignored numerous risks relevant to financial reporting, including events and circumstances that occurred or existed at Xybernaut during the Class Period which adversely affected the Company's ability to initiate, record, process and report financial data consistent with the assertions of management in the financial statements. These events or circumstances include, but are not limited to (i) changes in operating environment, in that such changes can result in changes in competitive pressures and significantly different risks, (ii) new or revamped information systems, in that significant and rapid changes in information systems can change the risk relating to internal control; (iii) rapid growth, in that significant and rapid expansion of operations can strain controls and increase the risk of a breakdown in controls; (iv) new technology, because incorporating new technologies into production processes or information systems may change the risk associated with internal control; (v) new business models, products, or activities, because entering into business areas or

-59-

transactions with which an entity has little experience may introduce new risks associated with

internal control; (vi) corporate restructures that may be accompanied by staff reductions and

changes in supervision and segregation of duties that may change the risk associated with internal

control; and (vii) new accounting pronouncements, because the adoption of new accounting

principles or changing accounting principles may affect risks in preparing financial statements.

141.    Grant Thornton violated GAAS and the standards set forth in SAS No. 1 and SAS

No. 53 by, among other things, failing to adequately plan its audit and properly supervise the

work of assistants and to establish and carry out procedures reasonably designed to search for and

detect the existence of errors and irregularities that would have a material effect upon

Xybernaut's financial statements.

142.    Grant Thornton violated GAAS and the standards set forth in SAS No. 8 by

failing to take appropriate action relating to material misstatements of fact contained in the

MD&A section of Xybernaut's 2002 10-K and 2003 10-K relating to the disclosures regarding

the recognition of revenue recognition related to certain product sales.

143.    Grant Thornton violated GAAS Standard of Field Work No. 2, which requires the

auditor to make a proper study of existing internal controls, including accounting, financial and

managerial controls, to determine whether reliance thereon was justified, and if such controls are

not reliable, to expand the nature and scope of the auditing procedures to be applied. The

standard provides that a sufficient understanding of an entity's internal control structure be

obtained to adequately plan the audit and to determine the nature, timing and extent of tests to be

performed. AU § 150.02. In all audits, the auditor should perform procedures to obtain a

sufficient understanding of three elements of an entity's internal control structure: the control

environment, the accounting system, and control procedures. AU § 319.02.

144.    As a result of its failure to accurately report on Xybernaut's financial statements

for the fiscal years 2002 and 2003, Grant Thornton failed in its role as an auditor as defined by

the SEC.  SEC Accounting Series Release No. 296, Relationships Between Registrants and

Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No. 18044,

states in part:

> Moreover, the capital formation process depends in large part on
> the confidence of investors in financial reporting.  An investor's
> willingness to commit his capital to an impersonal market is
> dependent on the availability of accurate, material and timely
> information regarding the corporations in which he has invested or
> proposes to invest.  The quality of information disseminated in the
> securities markets and the continuing conviction of individual
> investors that such information is reliable are thus key to the
> formation and effective allocation of capital.  Accordingly, the
> audit function must be meaningfully performed and the
> accountants' independence not compromised.  The auditor must be
> free to decide questions against his client's interest if his
> independent professional judgment compels that result.

145.    Grant Thornton's opinions, which represented that Xybernaut's financial

statements contained in the 2002 10-K and the 2003 10-K were presented in conformity with

GAAP, were materially false and misleading because Grant Thornton knew or was reckless in

not knowing that Xybernaut's financial statements violated the principles of fair reporting and

GAAP.  In the course of rendering its unqualified audit certification on Xybernaut's financial

statements for fiscal years 2002 and 2003, Grant Thornton knew it was required to adhere to each

of the herein described standards and principles of GAAS, including the requirement that the

financial statements comply in all material respects with GAAP.  Grant Thornton, in issuing its

unqualified opinions, knew (or recklessly disregarded) that by doing so, it was engaging in gross

departures from GAAS, thus making its opinions false, and issued such certifications knowing or recklessly disregarding that GAAS had been violated.

146.    Grant Thornton knew or recklessly disregarded facts that indicated that it should have (a) disclaimed or issued adverse opinions on Xybernaut's financial statements for fiscal years 2002 and 2003; or (b) withdrawn, corrected or modified its opinion for the years ended December 31, 2002 and 2003 to recognize Xybernaut's improper accounting and financial reporting stated above.

147.    Accordingly, Grant Thornton ignored the guidance under Section 10A of the Exchange Act, 15 U.S.C. § 78j-1, which requires the auditor to design procedures "to identify related party transactions that are material to the financial statements or otherwise require disclosure therein . . . ." In addition, Grant Thornton failed to evaluate all the information available concerning the related party transactions, to determine whether they were adequately disclosed, in accordance with SFAS 57, in the financial statements. See AU § 334.11.

148.    Grant Thornton ignored that "evidence of significant or extensive undisclosed related party transactions" is indicative of a significant deficiency in the design or operation of internal control that could adversely affect Xybernaut's "ability to record process, summarize, and report financial data consistent with the assertions of management in the financial statements." AU § 325.21.

149.    Grant Thornton failed to consider whether additional audit testing was required for related party transactions, it also regularly failed to undertake some of the basic audit procedures in connection with related party transactions. AU § 334.08. Moreover, once an auditor has identified related party transactions, the auditor should apply the procedures he

considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. AU § 334.09. The procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management. AU § 334.09.

150.    According to SAB No. 99, "quantitative benchmarks for assessing materiality (*e.g.*, a five percent threshold) do not apply in circumstances involving self-dealing and misappropriation of corporate assets by senior management."

**COUNT I**

**VIOLATION OF SECTION 10(b) OF THE**
**SECURITIES EXCHANGE ACT AND RULE 10b-5 THEREUNDER**
**(Against All Defendants)**

151.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth herein at length.

152.    Throughout the Class Period, Defendants, singly and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of conduct which operated as a fraud upon Plaintiff and the other members of the Class; made various false statements of material facts and omitted material facts to make the statements made not misleading to Plaintiff and the other members of the Class, and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of Xybernaut common stock and other securities.

153.    The Individual Defendants, as executive officers and/or directors of Xybernaut, had actual knowledge of the falsity of the material statements set forth above, and intended to

-63-

deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth by failing to ascertain and disclose the true facts in the statements made by them or other Xybernaut personnel to the SEC and the investing public, including Plaintiff and other members of the Class.

154.    The facts alleged herein compel a strong inference that the Defendants made material false and misleading statements to the investing public with scienter, in that the Defendants knew that the public statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.

155.    As a result of the foregoing, the market price of Xybernaut securities was artificially inflated during the Class Period. In ignorance of the falsity of the reports and statements, and the deceptive and manipulative devices and contrivances employed by the Defendants, Plaintiff and the other members of the Class reasonably relied, to their detriment, on the reports and statements described above and/or the integrity of the market price of Xybernaut securities during the Class Period in purchasing the Company's securities at prices which were artificially inflated as a result of the Defendants' false and misleading statements.

156.    Had Plaintiff and the other members of the Class known of the material adverse information which the Defendants failed to disclose and/or misrepresented, they would not have purchased Xybernaut securities at the artificially inflated prices that they did.

157.    Defendants' dissemination of this false and misleading material information, and

-64-

their failure to disclose material information that rendered their other statements false and misleading, served only to harm Plaintiff and the other members of the Class who purchased Xybernaut securities, in ignorance of the financial risk to them as a result of such false and misleading information.

158.    As a direct and proximate result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

159.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for the substantial damages which they suffered in connection with their purchase of Xybernaut securities during the Class Period.

### COUNT II

**VIOLATION OF SECTION 20(a)**
**OF THE SECURITIES EXCHANGE ACT**
**(Against E. Newman, S. Newman, Davis And Moynahan)**

160.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth herein at length.

161.    During the Class Period, each of the Individual Defendants, by virtue of his office or offices at, and/or directorship of Xybernaut and his specific acts, was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.

162.    Each of the Individual Defendants' positions made them privy to, and provided them with actual knowledge of, the material facts that Xybernaut misrepresented and/or concealed from Plaintiff and the other members of the Class during the Class Period.

163.    Each of the Individual Defendants had the power and influence, and exercised the

-65-

same, to cause Xybernaut to engage in the unlawful conduct and practices complained of herein by causing the Company to disseminate the false and misleading information identified above.

164.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

165.    By virtue of the conduct described above, Defendants are liable to Plaintiff and the other members of the Class for the substantial damages that they have suffered in connection with their purchase of Xybernaut common stock and other securities during the Class Period.

WHEREFORE, Plaintiff, on behalf of himself and the other members of the Class, demands judgment against Defendants as follows:

a.    Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.    Certifying Plaintiff as the Class Representative and his counsel as Lead Class Counsel;

c.    Declaring and determining that the Defendants violated the federal securities laws by reason of their conduct as alleged herein;

d.    Awarding monetary damages against all of the Defendants;

e.    Awarding Plaintiff the costs, expenses, and disbursements incurred in prosecuting this action, including reasonable attorneys' fees and other recoverable expenses of litigation; and

f.    Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem appropriate and just under all of the circumstances.

-66-

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury in this action for all claims against all Defendants.

ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.


Jessica Zeldin (Del. State Bar No. 3558)
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, Delaware 19899
jzeldin@rmgglaw.com
(302) 656-4433
Counsel for Plaintiff

OF COUNSEL:

SHEPHERD, FINKELMAN, MILLER & SHAH, LLC
James E. Miller
Patrick A. Klingman
Karen M. Leser
65 Main Street
Chester, Connecticut 06412
(860) 526-1100

SHEPHERD, FINKELMAN, MILLER & SHAH, LLC
Scott R. Shepherd
James C. Shah
35 East State Street
Media, Pennsylvania 19063
(610) 891-9880

LANDSKRONER • GRIECO • MADDEN, LTD.
Jack Landskroner
Paul Grieco
1360 West 9th Street  Suite 200
Cleveland, Ohio  44113
(216) 522-9000

SCHATZ & NOBEL, P.C.
Andrew M. Schatz
Jeffrey S. Nobel
One Corporate Center
20 Church Street
Hartford, Connecticut  06103
(860) 493-6292

May 18, 2005

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

_Joseph Daniel Wauhop_ ("Plaintiff"), certifies as follows:

1.    Plaintiff has reviewed the Complaint and retains Shepherd, Finkelman, Miller & Shah, LLC ("SFMS") to institute and/or pursue such action on a contingent fee basis pursuant to the terms of the accompanying Retainer Agreement.

2.    Plaintiff did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary. Plaintiff represents that he/she/it fully understands this Certification and the accompanying Retainer Agreement and is duly authorized to execute this Certification.

4.    All of Plaintiff's transaction(s) in the Xybernaut Corp. ("XYBR") debt or equity securities that are the subject of this action during the Class Period (between March 27, 2003 and April 8, 2005 inclusive) is/are listed below:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| _See Attached_ | | | |

(If you require additional space, please write "See Attached" above and attach separate sheet(s) providing the requested information.)

5.    During the three years prior to the date of this Certification, Plaintiff has never served, nor sought to serve, as a representative party in a federal securities class action except as listed below:

(Please identify above any class action in which you have served or sought to serve as a representative party.)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _30_ day of _April_, 2005, at _01:30_ _____ (city, state).

_Joseph Daniel Wauhop_
Print Name

_[signature]_
Signature

_16489 Robledo RD_
Mailing Address

_Gainesville VA. 20155_

### Attachment to Certification of Joseph Daniel Wauhop

Transactions in Xybernaut stock

| No. Of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 1200 | Sell | 9/02/03 | $0.77 |
| 160 | Buy | 9/15/03 | $1.43 |
| 1750 | Buy | 9/15/03 | $1.65 |
| 3250 | Buy | 9/22/03 | $2.04 |
| 509 | Buy | 9/23/03 | $2.20 |
| 36 | Buy | 10/30/03 | $1.88 |
| 2000 | Buy | 4/23/04 | $1.25 |
| 300 | Buy | 4/29/04 | $1.30 |
| 35 | Buy | 6/14/04 | $1.59 |