relevant part:

> "We are now beginning to see tangible results from the investments we
> have made in developing our technology platforms and our efforts to
> cultivate strategic vertical industry sectors," said Edward G. Newman,
> chairman, president and CEO for Xybernaut. "We have realized
> considerable success in various metrics that we consider key indicators of
> strong revenue growth. In addition, our restructuring activities are
> progressing well and we expect to achieve the savings outlined in our
> earlier announcement."

In addition, the Company reported the following:

> Enterprise customers are moving into broader deployments of Xybernaut
> solutions. Through the end of the first quarter 2002, the Company has sold
> more than 3,500 units of the Mobile Assistant series and realized over $17
> million in revenues from those sales.
>
> Xybernaut continues to expand Team Xybernaut(SM), its community of
> value-added resellers (VARs) and systems integrators. As of the end of the
> first quarter of 2001, less than 20 companies were participating in Team
> Xybernaut. Comparatively, during the first quarter of 2002 alone
> Xybernaut completed more than 20 Team Xybernaut agreements bringing
> the number of completed Team Xybernaut agreements to more than 95
> since the program's inception.
>
> Guidance
>
> The Company is increasing quarterly revenue guidance for the remainder
> of this year to 30% to 60% increases in revenue from the same quarters in
> the prior year.
>
> This guidance is up from the 25% to 50% quarterly increase previously
> provided. This guidance range indicates expected revenues of $2.6 million to
> $3.2 million for the second quarter ending June 30, 2002.

35.    On May 15, 2002, the Company filed its first quarter 2002 report with

the SEC on a Form 10-Q, reiterating the results it had announced in the May 9, 2002 press

release.

36.    On July 11, 2002, the Company issued a press release announcing that it

had raised more than $5 million in equity capital through a $4 million private placement of

12

common stock with institutional investors and the exercise of approximately $1 million of

warrants.

       37.    On August 13, 2002, the Company issued a press release announcing its

second quarter 2002 results. In the release, the Company stated as follows, in relevant part:

> FAIRFAX, Va., Aug 13, 2002 (BUSINESS WIRE) – Xybernaut(R) Corporation
> (Nasdaq: XYBR) today announced quarterly revenues of $2.0 million for its
> second quarter ended June 30, 2002, or approximately the same as revenues for
> the second quarter a year ago, and consistent with prior revised guidance. The
> net loss for the second quarter was $6.7 million, or $0.10 per share, compared
> with $8.5 million, or $0.17 per share, for the same period in the prior year.
>
> Hardware revenue for the quarter was $1.2 million, an increase of 102%
> from $0.6 million for the same period in the prior year.
>
> Operating expenses for the second quarter were $6.9 million, not including
> restructuring charges, a reduction of 21% from $8.7 million in the first quarter
> ending March 31, 2002 and a reduction of 31% from $10.1 million in the fourth
> quarter ending December 31, 2001.
>
> Revenue for the six months ended June 30, 2002 was $4.8 million,
> representing an increase of 12% versus revenue of $4.3 million for the same
> period a year ago. The Company reported a net loss of $14.7 million for the
> first six months of 2002, or $0.23 per share, versus a loss of $14.4 million,
> or $0.30 per share, for the first six months of 2001.
>
> "We are now beginning to see tangible results from the restructuring
> actions initiated earlier this year. These actions have included reductions
> in workforce, reductions in overseas operations and salary reductions for
> top executives ranging from 20-25%," said Edward G. Newman,
> chairman, president and CEO for Xybernaut. "With these cost reductions
> and expected revenue increases, we look forward to achieving our target
> of profitability in 2003," Newman added.
>
>     Revenue Guidance
>
> The Company reaffirmed revenue guidance for the third and fourth quarters of
> 2002 at a 30 to 60% increase from the equivalent quarters in the prior year;
> however, the Company also noted that the timing of orders and shipment of
> product could affect the timing of revenue realized in each of those quarters.

       38.    On the same day, August 13, 2002, the Company filed its second quarter

2002 report with the SEC on a Form 10-Q, reiterating its previously announced results.

13

39.    On November 14, 2002, Xybernaut issued a press release announcing its

third quarter 2002 results.  The release stated, in relevant part, as follows:

FAIRFAX, Va.--(BUSINESS WIRE)--Nov. 14, 2002--Xybernaut(R)
Corporation (Nasdaq: XYBR) today announced quarterly revenues of $2.5
million for its third quarter ended September 30, 2002.  This represents an
increase of approximately 26% from revenues during the preceding second
quarter of 2002 and an increase of approximately 10% over revenues during the
comparable third quarter of 2001.  The net loss for the third quarter was $7.9
million, or $0.10 per share, compared with $8.1 million, or $0.15 per share, for
the same period in the prior year.

Operating expenses, excluding restructuring and other non-recurring charges,
for the third quarter of 2002 were $6.0 million, a reduction of 41% from the
fourth quarter of 2001 and 14% from the preceding second quarter of 2002.

Revenue for the nine months ended September 30, 2002 was $7.4 million,
representing an increase of 11% versus revenue of $6.6 million for the same
period a year ago.  The Company reported net losses of $22.5 million for both
the first nine months of 2002 and 2001.

"Throughout 2002, Xybernaut has successfully introduced new product lines,
gained traction in critical industry segments, extended the Team Xybernaut(TM)
partner community, strengthened our intellectual property position and
demonstrated our ability to raise capital despite difficult market conditions,"
stated Edward G. Newman, chairman, president and CEO.

"We continue our drive to profitability and see significant benefits from the
restructuring and cost cutting initiatives we have undertaken throughout 2002,"
continued Newman.  "We expect to reduce our operating expenses by 50% over
prior levels.  We have significantly reduced our headcount, restructured
agreements with vendors and partners, reduced inventory commitments and
implemented various other cost saving strategies such as consolidating
international operations.  To build upon these successful efforts, I am pleased to
announce management changes within Xybernaut."

Revenue Guidance

The Company's previous guidance for revenues in the fourth quarter of 2002
remains unchanged; however, the Company also noted that the timing of orders
and shipment of product could affect the timing of revenue realized in that
period.

14

40.    On the same day, November 14, 2002, the Company filed its third

quarter 2002 report with the SEC on a Form 10-Q, reiterating its previously announced results.

41.    On March 27, 2003, Xybernaut issued a press release announcing its fourth

quarter and full-year 2002 results. In the release, the Company reported a 2% increase in

revenues compared to the same period in 2001 and a 17% increase in hardware revenues,

stating in relevant part, as follows:

> FAIRFAX, Va., Mar 27, 2003 (BUSINESS WIRE) -- Xybernaut(R) Corporation
> (NASDAQ: XYBR) today announced the results of its operations for the fourth
> quarter and full year 2002.
>
> Total revenues for 2002 were $10.0 million, a 2% increase over 2001. These
> results include a 17% increase in 2002 hardware revenues to $6.1 million. Total
> revenues for the fourth quarter ended December 31, 2002 were $2.6 million,
> representing an increase of approximately 2% over revenues during the third
> quarter of 2002.
>
> Net operating expenses for the fourth quarter of 2002 were $4.5 million, a
> reduction of 56% from the fourth quarter of 2001 and 26% from the third
> quarter of 2002. Net operating expenses exclude restructuring and certain other
> non-recurring charges and are discussed in further detail below. Net loss for
> 2002 decreased 17% from $32.2 million, or $0.63 per share, for 2001 to $26.6
> million, or $0.37 per share, for 2002.
>
> "Xybernaut continues to achieve considerable success despite challenging
> market conditions," stated Edward G. Newman, chairman, president and CEO.
> "We recently launched the third product in the successful Atigo(TM) family of
> mobile computers. We continue to strengthen our intellectual property, as
> evidenced through recent announcements of patent grants and an aggressive new
> licensing strategy. We have reorganized our management structure and
> strengthened our corporate governance through the appointment of two new
> independent directors to our board. Furthermore, we are amongst a small
> number of technology companies actually deploying comprehensive solutions
> into first responder and homeland security communities," added Newman.
>
> "I am very pleased to announce that Xybernaut has surpassed our previously
> stated targets related to reductions in operating expenses, as evidenced by the
> 56% decline in net operating expenses for the fourth quarter of 2002 over the
> comparable 2001 period," stated Tom Davis, senior vice president and CFO.
> "Additionally, we have recently been successful in eliminating a considerable

15

amount of long-term liabilities and commitments relating to both product and inventory."

42.    On March 28, 2003, Xybernaut filed its 2002 annual report with the SEC on a Form 10-K, reiterating its previously announced results in the March 27, 2003 press release.

43.    On April 2, 2003, the Company announced that it had raised $6.1 million from the completion of a $2.0 million private placement of common stock with institutional investors, a long-term borrowing of $1.75 million and the exercise of approximately $2.4 million of warrants. In reaction to this news, the price of Xybernaut stock rose $0.04 per share from its previous day's closing price of $0.38, to close at $0.42 on April 2, 2003.

44.    On June 19, 2003, the Company issued a press release announcing that it had raised another $7.75 million through private placements of Xybernaut common stock and the exercise of warrants.

45.    On August 11, 2003, the Company issued a press release announcing its second quarter 2003 results. The Company stated, in relevant part, as follows:

> FAIRFAX, Va., Aug 11, 2003 (BUSINESS WIRE) -- Xybernaut(R) Corporation (NASDAQ: XYBR) today announced that total revenue for the second quarter of 2003 (three months ended June 30) was $2.8 million, a 56% increase from the preceding first quarter of 2003, and a 38% increase from the comparable period in 2002.
>
> As of June 30, the Company had no long-term debt, a stockholders' equity balance of over $11 million and more than $5 million of cash on-hand. Subsequent to June 30, the Company also reported that it had raised an additional $3 million through warrant exercises.
>
> Hardware revenue for the second quarter of 2003 was $1.8 million, a 115% increase from the first quarter of 2003 and a 53% increase from the second quarter of 2002.
>
> Gross margin from hardware sales increased to 33% for the three months ended June 30, 2003 as compared with 12% for the three months ended June 30, 2002.

16

Margin for consulting and other sales increased to 38% in the second quarter of 2003 versus 34% in the second quarter of 2002.

The net loss for the second quarter of 2003 decreased over 50% to $3.3 million from the second quarter of 2002. The net loss per share also decreased to $0.02 per share from $0.10 per share in the prior year.

"The Company is moving in the right direction in virtually all areas. We are pleased with our second quarter results and especially the record revenue levels that we achieved. We are determined to do even better on all fronts as we move forward and my outlook remains highly positive," stated Steven A. Newman, Xybernaut president.

Thomas D. Davis, senior vice president and CFO, added, "We have continued our cost cutting efforts into 2003, streamlined operations and, with significant cash on-hand we now believe that we have more than enough capital to last us through the end of the year."

"From recent meetings with executives of some of the world's largest companies, I've seen first hand that these business leaders recognize that wearable computing has moved from a possible to a preferred mobile computing solution," stated Edward G. Newman, chairman and CEO. "Our primary objective is to steadily increase stakeholder value by leveraging these relationships and others as well as our expertise and successes to produce tangible results."

46.     On August 13, 2003, the Company filed its second quarter 2003 report with the SEC on a Form 10-Q which reiterated the results announced in the August 11, 2003 press release.

47.     On September 10, 2003, the Company issued a press release announcing that it had been awarded a contract worth $1.62 million by the U.S. Department of Defense to provide wearable computing technologies and solutions for U.S. military aircraft and defense maintenance systems. Defendant E. Newman touted the award of the defense contract, stating as follows:

"We are clearly proving that we have the desired mix of products, professional services and industry expertise to successfully compete for and win large contract awards from the U.S. military," stated Edward G. Newman, chairman and chief executive officer of Xybernaut. "Our years of effort invested in

17

> cultivating opportunities in this sector are yielding tangible, quantifiable results and demonstrate that Xybernaut is indeed being viewed as the preferred solution provider of wearable/computing solutions for our military forces."

In addition, defendant S. Newman stated as follows:

> "Xybernaut continues to execute key growth strategies to develop scalable, replicable mobile/wearable computing solutions that anticipate our customers' needs and deliver full function computing power where and when it is needed," said Steven A. Newman, Xybernaut president. "Xybernaut is meeting the unique and sophisticated demands of the U.S. military and fully expects that this relationship will drive dynamic revenue growth for our Company on an on-going basis."

In reaction to this news, the price of Xybernaut stock traded as high as $1.40 per share

on volume of over 25 million on September 10, 2003 before closing at $1.25.

48.     On September 29, 2003, the Company announced the completion of

another private placement of Xybernaut common stock for proceeds of approximately $7

million. In addition, the Company stated that it had received notification from Nasdaq that it

was in full compliance with Nasdaq continued listing requirements. Defendants Davis and E.

Newman commented on the purported success of the financing as follows:

> "These financings were executed with favorable terms and help us achieve what I consider to be the Company's strongest financial position since the initial public offering," stated Thomas D. Davis, Xybernaut CFO. "We have a strong cash position, maintain no debt and continue to keep our operating expenses at a low level."

> "We've seen positive results in recent quarters from our sales, marketing and business development efforts; we've introduced new and innovative products; we've secured important patents while aggressively protecting our intellectual property; and we are involved in numerous business ventures with key partners," said Edward G. Newman, Xybernaut chairman and CEO. "By taking advantage of this opportunity to strengthen our capital structure, Xybernaut is in a better position than ever to extend our recent positive momentum and continue to deliver the results that our customers and stakeholders deserve."

18

49.    On November 13, 2003, Xybernaut issued a press release announcing its

third quarter 2003 results, including a 6%, or $2.7 million, increase in revenues compared to

the same period in 2002. In the release, the Company stated, in relevant part, as follows:

> FAIRFAX, Va., Nov 13, 2003 (BUSINESS WIRE) -- Xybernaut(R)
> Corporation (NASDAQ:X)(BR) today announced that total revenue for
> the third quarter of 2003 (three months ended September 30) was $2.7
> million, a 6% increase from the same period in 2002.  These results
> represent the second highest levels of both U.S. revenues as well as
> worldwide consulting revenues in the Company's history.
>
> Net operating expenses for the three months ended September 30, 2003
> declined for the seventh consecutive quarter to $3.8 million.  This
> represents a reduction of over 62% from the fourth quarter of 2001 and a
> 36% reduction from the third quarter of 2002.
>
> The term "net operating expense" is discussed and reconciled in the "Non-
> GAAP Financial Measure" section of this press release.
>
> At September 30, the Company had no long-term debt, record quarter-end
> cash of over $13 million and record stockholders' equity of over $17
> million.
>
> The net loss for the third quarter of 2003 decreased 41 % to $4.7 million
> from the third quarter of 2002. The net loss per share also decreased to
> $0.03 per share from $0.10 per share in the prior year.

Defendant Davis commented on purportedly strong results, stating "Our future has never

looked brighter."  In addition, Davis stated as follows, in relevant part:

> Thomas D. Davis, CFO, noted, "Our cash and stockholders equity balances are
> both at record levels, we have no long term debt and we have successfully cut
> costs for seven consecutive quarters.  I continue to believe that we have the
> strongest financial position since our IPO."
>
> "Perhaps one of the best measures of our success is our ability to replicate
> customer wins in strategic markets," stated Steven A. Newman, president of
> Xybernaut.  "For example, since the Company's inception, we have secured
> hardware and services contracts in the transportation sector, alone, surpassing
> more than $10 million.  This focused approach is also producing similar strong
> results in many other targeted industries.  Our future has never looked brighter."

19

50.     On the same day, November 13, 2003, the Company filed its third quarter 2003 report with the SEC on a Form 10-Q, reiterating the results it had announced in the press release issued on the same day.

51.     On March 9, 2004, the Company issued a press release announcing "record" results for the fourth quarter and full-year 2004. In the release, the Company stated, in relevant part, as follows:

> The Company recorded its highest quarterly revenue ever during the fourth quarter of 2003. Revenue for the quarter ended December 31, 2003 was $3.7 million, a 43% increase over the fourth quarter of 2002 and a 38% increase over the third quarter of 2003. Total revenue for the full year 2003 increased 10% to $11.0 million, compared to $10.0 million for 2002. These year-end results include the highest levels of both product and consulting services revenues in the Company's history.
>
> The Company's net loss for the fourth quarter of 2003 was $5.3 million compared to a loss of $4.0 million in the comparable quarter of the prior year. The net loss for the entire year ended December 31, 2003 was $18.6 million compared to a loss of $26.6 million for 2002.
>
> At December 31, 2003, the Company had no long-term debt, cash of $9.5 million and stockholders' equity of $15.9 million.
>
> "The management and staff at Xybernaut have never been more focused," said Edward G. Newman, chairman and CEO of Xybernaut. "From record revenues, no debt and strong financial fundamentals; to growing demand from existing and new customers; to recent international successes, we are achieving on every level. Building on these achievements, management continues to be optimistic and encouraged by the prospects for 2004 and beyond."

52.     On March 12, 2004, the Company filed its 2003 annual report on a Form 10-K with the SEC, reiterating the results it had announced in the March 9, 2004 press release.

53.     On May 4, 2004, Xybernaut issued a press release announcing its first quarter 2004 results, reporting a 146% increase in total revenue from the same period in 2003. In the release, the Company stated, in relevant part, as follows:

20

FAIRFAX, Va.--(BUSINESS WIRE)--May 4, 2004--Xybernaut(R) Corporation (NASDAQ:XYBR) today announced that total revenue for the first quarter ended March 31, 2004 was $4.4 million, a 146% increase over the comparable 2003 period. Hardware revenue for the first quarter of 2004 totaled $2.9 million, increasing 256% from the first quarter of 2003.

This represents the Company's second consecutive quarter of record revenue. Last quarter, the period ended December 31, 2003, the Company reported revenue of $3.7 million, a 43% increase in revenue over the fourth quarter of 2002.

As of the end of the first quarter 2004, the Company had no long-term debt, cash of $12.5 million and record stockholders' equity of $18.3 million.

"We are pleased to announce back-to-back quarters with record revenue and strong year-to-year revenue growth," said Edward G. Newman, chairman and CEO of Xybernaut. "This strong momentum helps validate our belief that the more widespread adoption of wearable/mobile technologies is happening now. Our products and solutions are being deployed today and they are being deployed in record numbers. With low expenses and our losses decreasing, I continue to remain optimistic and positive about our prospects for the remainder of 2004 and thereafter," continued Newman.

54.     On May 7, 2004, the Company filed its 2003 annual report with the SEC

on a Form 10-K, reiterating the results it had announced in the May 4, 2004 press release.

55.     On August 5, 2004, Xybernaut issued a press release announcing its

second quarter 2004 results, reporting a 21%, or $3.4 million, increase in total revenue from

the same period in 2003. In the release, the Company stated, in relevant part, as follows:

FAIRFAX, Va.--(BUSINESS WIRE)--Aug. 5, 2004--Xybernaut(R) Corporation (NASDAQ: XYBR) today announced results for its second quarter ended June 30, 2004. Total revenue for the second quarter of 2004 was $3.4 million, a 21% increase from the comparable 2003 period. Total revenue for the six months ended June 30, 2004 was $7.8 million, a 70% increase from the six months ended June 30, 2003. Beginning with the fourth quarter of 2003 and continuing through the second quarter of 2004, the Company has now reported its highest three quarterly revenues ever.

The Company also reported a strong balance sheet. As of June 30, 2004, the Company had no long-term debt, cash of $13.3 million and stockholders' equity of $16.5 million.

21

Defendant E. Newman touted the Company's results as follows:

> "With revenues up 70%, the value of our intellectual property now being validated and having just come off the Company's strongest three quarters ever, I am confident that we are not only on the right track but also that our growth in many areas will now be sharply accelerating as we move forward," said Edward G. Newman, chairman and CEO of Xybernaut.

> "Xybernaut solutions and technologies based on our intellectual property are now being deployed into a wide variety of major market sectors from homeland security applications used to examine moving cargo containers; to systems that can detect guns; to in-the-field monitoring solutions to combat West Nile virus; to information delivery systems used by Wall Street traders; to even a solution that will allow a disabled child to learn to communicate," Newman added.

56.    On August 6, 2004, the Company filed its second quarter 2004 report

with the SEC on a Form 10-Q, reiterating the results it had announced in the August 5, 2004

press release.

57.    On November 9, 2004, the Company issued a press release announcing

its third quarter 2004 results and reporting another increase in total revenue, as follows:

> FAIRFAX, Va., Nov 9, 2004 (BUSINESS WIRE) -- Xybernaut(R) Corporation (NASDAQ: XYBR) today announced results for its third quarter ended September 30, 2004. Total revenue for the third quarter of 2004 was $3.2 million, a 20% increase from the comparable 2003 period. Total revenue for the nine months ended September 30, 2004 was $11.0 million, a 51% increase from the nine months ended September 30, 2003.

> Other financial highlights for the three months ended September 30, 2004 include:

> -- Licensing revenue from the non-exclusive grant of one of the

>    Company's "Dual-Use Flat Panel Display" patents;

> -- Shipments of Atigo T systems to Tesco pursuant to the

>    Company's recently announced $9 million order; and

> -- Beginning with the fourth quarter of 2003 and continuing through the third quarter of 2004, the Company has now reported its highest four quarterly revenues ever[.]

22

Defendant E. Newman claimed that the Company was experiencing "top-line growth," stating, as follows:

> "We are well on our way to our most successful year ever. In fact, our total nine-month revenues have already surpassed our previous 12-month high," stated Edward G. Newman, chairman and CEO of Xybernaut. "This top-line growth is the direct result of our continued and successful efforts to bring in new and larger customers while still maintaining our focus on existing partners. With our recently announced management team and enhanced corporate governance initiatives in place, I firmly believe that we are poised to continue to deliver positive results through the rest of 2004, 2005 and beyond."

58.    On the same day, November 9, 2004, the Company filed its third quarter 2004 report with the SEC on a Form 10-Q, reiterating the results announced in the press release issued on the same day.

59.    On December 16, 2004, the Company issued a press release about its annual shareholder meeting. In the release, defendant S. Newman stated that "2004 continues to be a banner year for the company as we anticipate continued success moving forward. Our efforts remain focused on enhancing both near and long-term shareholder value."

60.    The statements referenced above in ¶¶34-59 were materially false and misleading and known or recklessly disregarded as such by defendants because they failed to disclose the following facts, among others:

(a)    the Company's accounting and related disclosures in its financial statements during the Class Period were inadequate, improper, and inherently unreliable as evidenced by, among other things, the Company's auditor's public declaration that "it can no longer rely on management's representations";

(b)    defendant Edward G. Newman misappropriated Company funds for personal expenses;

23

(d)      the SEC had commenced an investigation of the Company relating to the

sale of Xybernaut securities by a shareholder; and

(e)            the Company lacked adequate internal controls.

### THE TRUTH BEGINS TO EMERGE

61.     The truth began to emerge on February 17, 2005. On that day, after

weeks of decline in the price of the Company's stock, Xybernaut issued a press release

responding to shareholder inquiries, stating "that it knows of no business reason or financial

condition that would explain the decline in its stock price."

62.     On March 14, 2005, Xybernaut issued a press release announcing that it

had sought, and was granted, an extension to file its 2004 annual report with the SEC.  The

Company stated that it intended to file its annual report by March 31, 2005.  In reaction to this

news, the price of Xybernaut stock fell another $0.12 from its closing price of $0.72 on March

11, 2005, the previous trading day, to close at $0.60 on March 14, 2005.

63.     The statements referenced above in ¶¶ 61 and 62 were materially false

and misleading and known or recklessly disregarded as such by defendants for the reasons set

forth in ¶ 60.

64.     On March 31, 2005, after the market closed, defendants issued a press

release revealing that they had discovered material weaknesses in Xybernaut's internal controls

with respect to expense reimbursement, revenue recognition, and the monitoring of business

risks.  Defendants stated that the Company had engaged independent legal counsel to conduct

an internal investigation of these matters.  Moreover, defendants stated that as a result of the

investigation, the Company could not predict when it would be able to file its 2004 annual

report with the SEC, and cautioned that the delayed filing would prevent the Company from

24

registering additional shares of stock.  In addition, the Defendants revealed for the first time

that, on February 1, 2005, nearly two months earlier, it had received a subpoena from the SEC

relating to the sale of securities by an unidentified shareholder. Xybernaut also announced that

it had received notification from Nasdaq that the Company's stock, which had been trading

below $1.00 per share, was subject to delisting.  The Company stated, as follows:

> FAIRFAX, Va., Mar 31, 2005 (BUSINESS WIRE) -- Xybernaut Corporation
> (NASDAQ: XYBR) announced today that the filing of its Form 10-K and other
> related reports for the year ended December 31, 2004, anticipated to occur
> today, will be further delayed, pending completion of an internal investigation
> undertaken by its Audit Committee.
>
> On February 28th, the Audit Committee engaged independent counsel - Alston
> & Bird LLP - to assist it in conducting an internal investigation of, among other
> things, concerns brought to the Audit Committee's attention relating to the
> internal control environment of the Company, the propriety of certain
> expenditures and the documentation of certain expenses of the Chairman and
> CEO of the Company, the Company's transparency and public disclosure
> process, the accuracy of certain public disclosures, management's conduct in
> response to the investigation, and the propriety of certain major transactions.
> The Audit Committee's investigation is continuing, and the filing of the
> Company's 10-K will await the conclusions of that investigation.  At this time,
> the Company is unable to predict when its 10-K will be filed.
>
> On February 1, 2005, the Company received a subpoena from the Northeast
> Regional Office of the Securities and Exchange Commission, seeking
> documents and other information relating to the sale of Company securities by
> any person identified as a selling shareholder in any Company registration
> statement or other public filing.
>
> As a result of the delayed filing of its Form 10-K, the Company will lose its
> status to file registration statements on form S-3, which has historically been
> utilized to expedite the registration of common stock issued in connection with
> the Company's financings.  The loss of the right to use form S-3 could have a
> material impact on the ability of the Company to raise additional funds in the
> future, and therefore affect its ability to meet its obligations as they come due.
>
> Management is still in process of completing the Sarbanes-Oxley 404 internal
> control testing for the year ended December 31, 2004.  However, certain
> material weaknesses currently have been identified related to the control
> environment and control activities as it relates to the Company's policies and

25

procedures in the expense reimbursement process, revenue recognition related to certain product sales, and monitoring of business risks. Management continues to evaluate the identified issues and is addressing remediation plans to be implemented.

Xybernaut also announced unaudited results for the year end December 31, 2004 in addition to 4th quarter results. Revenues for 2004 were approximately $13.9 million, with a net loss of approximately $19.7 million. Revenues for the 4th quarter were approximately $2.9 million, with a net loss of approximately $7.2 million. These unaudited results do not include possible further adjustments, including but not limited to, the matters discussed above.

On March 30, 2005 the Company received notice from the NASDAQ Stock Market that the bid price of the Company's common stock has closed below the minimum $1.00 per share requirement for the stock's continued listing under Marketplace Rule 4310(c)(4) (the "Rule"). Therefore, the Company has until September 26, 2005 to become compliant. If, at any time before September 26, 2005, the bid price of the Company's common stock closes at $1.00 per share or more for a minimum of 10 consecutive business days, the Company will comply with NASDAQ's listing requirements. If not, NASDAQ will determine whether the Company meets NASDAQ SmallCap Market initial listing criteria as set forth in Marketplace Rule 4310(c), except for the bid requirement. If the Company meets the initial listing criteria, the Company will be granted an additional 180 day compliance period. If the Company is not eligible for an additional compliance period, the Company's securities will be delisted. At that time, the Company can appeal NASDAQ's determination to delist its securities to a Listing Qualifications Panel

In reaction to this news, the price of Xybernaut dropped another $0.18 per share from its closing price of $0.42 on March 31, 2005, to close at $0.24 on April 1, 2005

65.     On April 8, 2005, Xybernaut issued a press release revealing further bad news the Company had received a letter from its independent auditor, Grant Thornton, questioning the accuracy and reliability of the Company's accounting and related disclosures, and that, as a result, investors should not to rely on certain of the Company's historical financial statements. The Company stated as follows:

FAIRFAX, Va.--(BUSINESS WIRE)--April 8, 2005--Xybernaut® Corporation (NASDAQ:XYBRE - News) announced today that investors and others should refrain from relying upon the Company's historical financial statements, together with the related audit reports the Company received from its outside

26

auditors, Grant Thornton LLP, for the years ended December 31, 2002 and 2003, and interim quarterly reports for the quarters ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004.

The Company's action was taken in response to a letter which the Company received from Grant Thornton LLP, on April 6, 2005, indicating that the nature of the items disclosed by the Company in its Form 8-K filed on April 1, 2005, and the uncertainties surrounding the results of the ongoing Audit Committee investigation disclosed in such Form 8-K, have caused the firm to question the accuracy and reliability of the Company's accounting and related disclosures provided in the specified prior period financial statements. The Audit Committee has reviewed the Company's disclosure in this press release and in the Company's related Form 8-K with Grant Thornton LLP.

Upon completion of the Audit Committee's investigation, the Company intends promptly to implement any recommendations resulting from the Audit Committee's investigation and to take any other actions necessary to satisfy the concerns raised by Grant Thornton LLP. The Company has retained Kalorama Partners, LLC, a consulting firm founded by former SEC Chairman Harvey Pitt, to assist the Company in fulfilling these commitments.

The Company also announced today that on April 5, 2005, it received notice from The Nasdaq Stock Market of Nasdaq's intent to delist the Company's securities at the opening of business on April 14, 2005, subject to the Company's right to request a hearing with the Nasdaq Listing Qualifications Panel in accordance with the Marketplace Rule 4800 Series. In the notice, Nasdaq asserted that the Company is in violation of Nasdaq Marketplace Rule 4310(c)(14) because, as the Company previously announced, it has not yet filed its Annual Report on Form 10-K with Nasdaq and the SEC. Prior to April 12, 2005, the Company intends to request a hearing before a Nasdaq Listing Qualifications Panel to review the staff's determination which will suspend the delisting of the Company's securities until the hearing determination. There can be no assurance that, following the hearing, the Panel will grant the Company's request for continued listing.

In addition, as provided in the notice, at the opening of business on April 7, 2005, an "E" was appended to the end of the Company's trading symbol for its securities, so that the symbol became "XYBRE."

In reaction to this news, the price of Xybernaut stock, which had already fallen $0.23 per share since the Company's announcement on March 14, 2005 that it would not be able to timely file its annual report, fell another $0.06 to close at $0.13 on the next trading day, April 11, 2005.

27

66. On April 19, 2005, the Company announced after the market had close

the completion of its internal investigation and the following shocking findings:

1. The Company's Chairman and CEO, Edward G. Newman, improperly used substantial Company funds for personal expenses and failed properly to substantiate expenses charged to the Company.

2. Members of the CEO's family employed by the Company were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.

3. The employment of certain members of the CEO's family was not disclosed in SEC filings as required by SEC disclosure regulations.

4. There has been a lack of adherence to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.

5. Major transactions were entered into by certain members of senior management in violation of Company internal controls. Certain members of Senior management failed properly to advise the Board of material financial conditions regarding major transactions.

6. Certain members of senior management failed to disclose to the Audit Committee and the Board written correspondence by the Company's former Chief Financial Officer outlining serious concerns over the breakdown of internal controls; and

7. Edward G. Newman and Steven A. Newman affirmatively impeded the Audit Committee's investigation in material respects.

In response to the Audit Committee's Report and Recommendations, the Board today approved the following actions:

1. Edward G. Newman was removed as Chairman of the Board and Chief Executive Officer of the Company, and from all other positions he holds with any Company subsidiaries or affiliates.

2. Steven A. Newman was removed as President and Chief Operating Officer of the Company, and Vice Chairman of the Board, and from all other positions he holds with any Company subsidiaries or affiliates.

3. The Board formally requested the resignations of Edward G. and Steven A. Newman as Directors of the Company, but neither individual has agreed to resign from the Board at this time.

4. Retired General William Tuttle was appointed as the Company's Interim Chairman of the Board and Chief Executive Officer, while a search is conducted for new management.

5. The Board authorized the retention of financial experts to assist the Board in maximizing shareholder value.

6. In an effort to promote the independence of the Company's Board, three directors of the Company -- James J. Ralabate, Dr. Edwin Vogt and Martin Weisberg, each of whom provides other services for the Company -- offered to resign from the Board. The Board determined to defer its acceptance of these offers upon an orderly transition to a new Board.

The Company also announced that Grant Thornton LLP has resigned as the Company's independent auditors. The Company received a letter from Grant Thornton LLP on April 14, 2005, stating that Grant Thornton LLP has concluded that, in its professional judgment, it can no longer rely on management's representations and has resigned as the Company's registered independent accounting firm. On April 8, 2005, the Company advised investors and others that, based upon a letter the Company received from Grant Thornton LLP on April 6, 2005, no reliance should be placed upon certain of the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors. In light of Grant Thornton LLP's resignation, the Company advises investors and others to continue to refrain from relying upon any of the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors, Grant Thornton LLP.

The reports of Grant Thornton LLP on the Company's financial statements for the 2002 and 2003 fiscal years did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles. In addition, in connection with the audits of the Company's financial statements for fiscal years 2002 and 2003, and in the subsequent interim periods, there were no disagreements between the Company and Grant Thornton LLP on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure which, if not resolved to the satisfaction of Grant Thornton LLP, would have caused Grant Thornton LLP to make reference to the matter in connection with its report.

However, as noted above, Grant Thornton LLP has now concluded that, in its professional judgment, it can no longer rely on management's representations. After Grant Thornton LLP was advised of the results of the Audit Committee investigation, Grant Thornton LLP advised the Audit Committee's counsel that certain members of senior management failed to disclose facts material to the financial statements and the weaknesses in the internal controls. The Audit Committee has discussed the basis for Grant Thornton LLP's conclusion with

29

Grant Thornton LLP and has authorized Grant Thornton LLP to respond fully to the inquiries of any successor accountant concerning this subject. The Audit Committee has reviewed the Company's disclosure in this press release and in the Company's related Form 8-K with Grant Thornton LLP.

In light of Grant Thornton LLP's resignation as the Company's independent auditor and the other matters discussed above, the Company is unable to predict when new auditors will be selected and its Form 10-K will be filed.

67.    On April 25, 2005, Xybernaut announced that the United States Attorneys Office for the Eastern District of Virginia had commenced an investigation of the Company relating to the wrongdoing discovered in it internal investigation. In addition, Xybernaut stated that "it continues to face a severe liquidity crisis and possible insolvency" and that it may not have sufficient cash to meet its financial obligations or fund continuing operations. To address these concerns, the Company announced the formation of the Office of the Chairman of the Board consisting of three co-chairmen. In the release, the Company stated, in relevant part, as follows:

> FAIRFAX, Va.--(BUSINESS WIRE)--April 25, 2005-- Xybernaut® Corporation (NASDAQ: XYBRE - News) today announced that William Tuttle and two other outside directors, Harry E. Soyster and Marc Ginsberg, will serve as co-chairmen in a newly created Office of the Chairman of the Board. Although the three co-chairmen will act as directors and not as management, they will provide counsel and be a resource to senior management.
>
> On April 23, 2005, Tuttle formally resigned as the Company's Interim Chairman and Chief Executive Officer and joined Soyster and Ginsberg in forming the newly created Office of Chairman of the Board. Tuttle's resignation was based upon his concerns about his ability to satisfy unilaterally the significant time commitments required to effectively address the needs of shareholders and employees. Tuttle also stated that he remains committed to continued participation in the effort to determine the best way forward for the Company, working along with Soyster and Ginsberg.
>
> The Company also announced that the Company was contacted Friday, April 22 by the U. S. Attorney's Office for The Eastern District of Virginia, which is opening an investigation. In addition, the Audit Committee, through its legal counsel, has contacted the Securities and Exchange Commission in connection

30

with the previously disclosed Audit Committee investigation and findings. The Company will cooperate fully in these investigations and any others.

The Company also affirmed that it continues to face a severe liquidity crisis and possible insolvency. There can be no assurances that the Company will have sufficient cash to meet its financial obligations or fund continuing operations. The Office of the Chairman of the Board is authorized to retain a consultant with financial and management restructuring expertise. The Company intends to work with such adviser to reduce costs, conserve cash, and obtain advice regarding restructuring and other alternatives to maximize shareholder value.

## UNDISCLOSED ADVERSE INFORMATION

68.     The market for Xybernaut's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Xybernaut's common stock traded at artificially inflated prices during the Class Period. The artificial inflation continued until at least April 8, 2005. Plaintiff and other members of the Class purchased or otherwise acquired Xybernaut securities relying upon the integrity of the market price of Xybernaut's securities and market information relating to Xybernaut, and have been damaged thereby.

69.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Xybernaut's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

70.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of

31

materially false or misleading statements about Xybernaut's business, prospects and

operations. These material misstatements and omissions had the cause and effect of creating in

the market an unrealistically positive assessment of Xybernaut and its business, prospects and

operations, thus causing the Company's securities to be overvalued and artificially inflated at all

relevant times. Defendants' materially false and misleading statements during the Class Period

resulted in plaintiffs and other members of the Class purchasing the Company's securities at

artificially inflated prices, thus causing the damages complained of herein.

### ADDITIONAL SCIENTER ALLEGATIONS

71.     As alleged herein, defendants acted with scienter in that defendants knew

that the public documents and statements issued or disseminated in the name of the Company

were materially false and misleading; knew that such statements or documents would be issued

or disseminated to the investing public; and knowingly and substantially participated or

acquiesced in the issuance or dissemination of such statements or documents as primary

violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by

virtue of their receipt of information reflecting the true facts regarding Xybernaut, their control

over, and/or receipt and/or modification of Xybernaut's allegedly materially misleading

misstatements and/or their associations with the Company which made them privy to

confidential proprietary information concerning Xybernaut, participated in the fraudulent scheme

alleged herein. In addition, defendants were motivated to engage in the fraudulent scheme to

complete at least $25.85 million in private placements of Company stock and warrants, and long-

term borrowings.

### XYBERNAUT'S FINANCIAL STATEMENTS DURING THE CLASS PERIOD WERE MATERIALLY FALSE AND MISLEADING AND VIOLATED GAAP

32

72.     At all relevant times during the Class Period, defendants represented that Xybernaut's financial statements when issued were presented in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. However, in order to artificially inflate the price of Xybernaut's stock, defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate its assets, stockholders' equity and earnings during the Class Period.

73.     Xybernaut's materially false and misleading Financial Statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding Xybernaut's actual operating results. Specifically, as discussed herein, defendants caused the Company to violate GAAP by (1) improperly accounting for revenue related to certain product sales; (2) improperly accounting for expense reimbursements; and (3) failing to disclose and properly account for related party transactions in accordance with GAAP and SEC rules.

74.     GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial
> performance during a period. Investors and creditors often use information
> about the past to help in assessing the prospects of an enterprise. Thus, although
> investment and credit decisions reflect investors' and creditors' expectations

33

about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

75.    As set forth in SEC Rule 4-01 (a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing financial statements that conform with GAAP.  As noted by the AICPA professional standards:

> financial statements are management's responsibility .... [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management ....  Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

## Xybernaut's Improper Failure To Disclose Material Related Party Transactions

76.    In FASB's Statement of Financial Accounting Standard ("SFAS") No. 57 Related Party Disclosures (March 1982), GAAP provides guidance on disclosures of transactions between related parties.[1]  SFAS No. 57 states that an "enterprise's financial statements may not be complete without additional explanations of and information about related party transactions and thus may not be reliable."  Accordingly, *SFAS No. 57 requires that financial statements identify material related party transactions and disclose (a) the "nature of the relationship(s)," (b) a "description of the transactions," (c) the "dollar amount of*

---

[1] Pursuant to SFAS No. 57, related party transactions include transactions between an enterprise and its Directors, CEO, COO, Vice Presidents in charge of principal business functions, and other persons who perform similar policy-making functions.

34

*transactions far each period for which an income statement is presented, " and (d) the*

*"[A/mounts due from or to the related parties as of the date of each balance sheet."[2]*

(Emphasis added.)

       77.    In addition, as noted in the SEC's SAB Topic 4E, GAAP provides that:

> *[I]n some cases, the significance of an amount may be independent of the amount involved.  For example, amounts due to and from officers and directors, because of their special nature and origin, ought generally to be set forth separately [in financial statements] even though the dollar amounts involved are relatively small.*  (Emphasis added.)

       78.    As Xybernaut has now admitted, before and during the Class Period, it engaged in numerous material related party and self-dealing transactions that were not disclosed in its financial statements in violation of GAAP, including at least the following (during the Class Period):

       a.    Defendant Edward Newman's improper use of substantial Company funds for personal expenses and failure to properly substantiate expenses charged to the Company; and

       b.    Major transactions entered into by certain members of senior management in violation Company internal controls and their failure to properly advise the Board of Directors of material financial conditions regarding the transactions.

       79.    Moreover, GAAP, in APB Opinion NO. 22, *Disclosure of Accounting Policies* ¶ 7 (April 1972), provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company. In fact, GAAP states that information about the accounting

---

[2] Pursuant to SFAS No. 57, disclosure of compensation arrangements that are not in the ordinary course is necessary

policies adopted by a reporting company is "essential" for financial statement users. *Id* ¶ 8.

Accordingly, GAAP, in paragraph 12 of APB Opinion No. 22 provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:
>
> a.    A selection from existing acceptable alternatives;
>
> b.    Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry;
>
> c.    Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

80.    Xybernaut's Class Period financial statements were thus also false and misleading and failed to comply with GAAP because they failed to disclose and identify the improper accounting of revenue related to certain product sales. Accordingly, investors were unable to assess the appropriateness of, or the risks associated with, Xybernaut's financial reporting.

81.    Xybernaut's failures violated a number of additional GAAP provisions. For example, GAAP provides that:

a.    financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (CON No. 1, ¶ 34);

b.    financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of

---

for users to understand financial statements.

transactions, events and circumstances that change resources and claims to those resources (CON No. 1, ¶ 40);

        c.     financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (CON No. 1, ¶ 50);

        d.     financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (CON No. 1, ¶ 42);

        e.     financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (CON No. 2, ¶¶58-59);

        f.     financial reporting should be complete, so that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (CON No. 2, ¶ 79); and

        g.     financial reporting should be conservative and ensure that uncertainties and risks inherent in business situations are adequately considered. The best way

37

to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (CON No. 2, ¶¶ 95, 97).

### Failure to Maintain an Adequate System of Internal Controls

82.     In addition to the foregoing improper accounting practices, the Company also suffered from a chronic and systematic breakdown of its internal accounting controls throughout the Class Period, which rendered Xybernaut's financial reporting inherently corrupt, subject to manipulation and unreliable, resulting in materially false and misleading financial statements.

83.     In this regard, the defendants failed to design and implement an internal control system over the Company's financial reporting processes allowing defendants to improperly report revenue related to the sale of certain products, and to engage in improper related party transactions.

84.     Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must:  (A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and disposition of the assets of the issuer; and (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

85.     Xybernaut violated Section 13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning its reporting of revenue related to certain product

38

sales, related party transactions entered into by members of the Company's senior management, and reimbursements of expenses. Accordingly, Xybernaut violated Section 13(b)(2)(A) of the Exchange Act.

86.    In addition, Xybernaut violated Section 13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities. Xybernaut failed to put into place proper reviews and checks to ensure that its management did not engage in accounting improprieties. It failed to ensure that transactions were reported in accordance with its own policies and with GAAP. Accordingly, Xybernaut violated Section 13(b)(2)(B) of the Exchange Act.

87.    Xybernaut's lack of adequate internal controls rendered Xybernaut's Class Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP. Nonetheless, throughout the Class Period, the Company regularly issued quarterly and annual financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

## DEFENDANT GRANT THORNTON LLP
## PARTICIPATION IN THE FRAUD AND ITS SCIENTER

88.    Defendant Grant Thornton is a worldwide firm of certified public accountants, auditors, and consultants. Grant Thornton's website states that "[t]hrough member firms in 110 countries, including 49 offices in the United States, the partners of Grant Thornton member firms provide personalized attention and the highest quality service to public and private clients around the globe." Through its Vienna, Virginia office, Grant Thornton served as Xybernaut's auditor and principal accounting firm since fiscal 2000. Grant Thornton was required to audit the Company's financial statements in accordance with Generally Accepted

39

Auditing Standards ("GAAS ")[3], and to report the audit results to Xybernaut, the board of directors, the audit committee, and the members of the investing public, including plaintiffs and other members of the Class. With knowledge of Xybernaut's true financial condition, or in reckless disregard thereof, Grant Thornton certified the materially false and misleading financial statements of Xybernaut, described below and provided unqualified Independent Auditors' Reports, which were included in the SEC filings and publicly disseminated statements. Without these materially false and misleading unqualified audit opinions, the fraud alleged above could not have been perpetrated.

**Grant Thornton Had Full and Complete Access to Xybernaut's Information**

89.     Grant Thornton, by virtue of its of its relationship with Xybernaut and the nature of the auditing and consulting services rendered to the Company, and the fact that Grant Thornton's personnel were regularly present at Xybernaut and had intimate knowledge of Xybernaut's financial reporting practices based on its access to confidential internal corporate, financial, operating and business information, Grant Thornton knew of or recklessly disregarded the adverse facts alleged herein concerning the Company's improper financial reporting during the Class Period, including the Company's fiscal 2002 and 2003 year-end financial statements and Grant Thornton's unqualified audit opinions thereon. Nonetheless, Grant Thornton knowingly, or recklessly, issued false unqualified audit opinions during the Class Period.

**Grant Thornton Failed to Render an Accurate Audit Report**

90.     Grant Thornton violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance

---

[3] GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA")[3] relate to the conduct of the individual audit engagements. Statements on Auditing Standards (codified and referred to as AU § __)

with GAAP.  AU § 508.04.  Grant Thornton's opinion falsely represented that Xybernaut's

fiscal 2002 and 2003 financial statements were presented in conformity with GAAP when they

were not for the myriad reasons herein alleged.

      91.    The auditor's report must express an opinion on the financial statements

taken as a whole and must contain a clear indication of the character of the auditor's work.

The auditor can determine that he is able to express an unqualified opinion only if he has

conducted his audit in accordance with GAAS.  AU § 508.07.

      92.    Grant Thornton did not render an accurate audit report and thus did not

exercise due professional care, because Xybernaut's financial statements were not in

conformity with GAAP, and because Grant Thornton failed to perform sufficient procedures to

audit Xybernaut's financial statements as of December 31, 2002 and 2003, in accordance with

GAAS.

      93.    Grant Thornton issued its audit opinion, dated February 13, 2003, except

for Notes 3 and 14, as to which the date is March 26, 2003, on Xybernaut's fiscal 2002

financial statements.  Grant Thornton's opinion stated that such Xybernaut financial statements

were presented in conformity with GAAP and that Grant Thornton's audit was performed in

accordance with GAAS:

> We have audited the accompanying consolidated balance sheets of Xybernaut
> Corporation (a Delaware corporation) as of December 31, 2002 and 2001, and
> the related consolidated statements of operations, stockholders' equity, and cash
> flows for the three years then ended.  These financial statements are the
> responsibility of the Company's management.  Our responsibility is to express
> an opinion on these financial statements based on our audits.
>
> We conducted our audits in accordance with auditing standards generally
> accepted in the United States of America.  Those standards require that we plan
> and perform the audit to obtain reasonable assurance about whether the financial
> statements are free of material misstatement.  An audit includes examining, on a

---

are recognized by the AICPA as the interpretation of GAAS.

41

test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Xybernaut Corporation as of December 31, 2002 and 2001, and the results of its operations and its cash flows for the three years then ended in conformity with accounting principles generally accepted in the United States of America.

94.    Grant Thornton issued its audit opinion, dated February 19, 2004, on

Xybernaut's fiscal 2003 financial statements, which it stated were presented in conformity with

GAAP and that Grant Thornton's audit was performed in accordance with GAAS:

We have audited the accompanying consolidated balance sheets of Xybernaut Corporation (a Delaware corporation) as of December 31, 2003 and 2002, and the related consolidated statements of operations, stockholders' equity, and cash flows for the three years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Xybernaut Corporation as of December 31, 2003 and 2002, and the results of its operations and its cash flows for the three years then ended in conformity with accounting principles generally accepted in the United States of America.

95.    In issuing such audit opinions, Grant Thornton turned a blind eye to

Xybernaut's improper accounting practices, as described above, and issued unqualified audit

opinions on Xybernaut's fiscal 2002 and 2003 financial statements, even though Grant

42

Thornton knew or recklessly disregarded that: (a) the financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position of Xybernaut and its subsidiaries as of December 31, 2002 and 2003, and the results of their operations and cash flow for the years ended December 31, 2002 and 2003; and (b) Grant Thornton had not audited Xybernaut's fiscal 2002 and 2003 financial statements in accordance with GAAS. As set forth in detail herein, Xybernaut's violations of GAAP during the Class Period include, among other things:

- the improper reporting of revenue relating to certain product sales;
- improper accounting of related party transactions entered into by members of the Company's senior management; and
- improper accounting of reimbursement of Company expenses.

**Grant Thornton Failed to Obtain Sufficient Competent Evidential Matter**

96.     During the course of Grant Thornton's audits of Xybernaut, there appeared "red flags" which should have raised questions in the auditors' minds and led them to procure additional evidential matter. In conducting an audit, an auditor must obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. AU § 326.01.

97.     For example, during the Class Period, Grant Thornton knew or recklessly disregarded the following "red flags":

1. The Xybernaut Defendants' willingness and desire of the Company's Chairman and CEO, Edward G. Newman, improperly used substantial Company funds for personal expenses and failed properly to substantiate expenses charged to the Company.

43

2. Members of the CEO's family employed by the Company were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.

3. The employment of certain members of the CEO's family was not disclosed in SEC filings as required by SEC disclosure regulations.

4. There has been a lack of adherence to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.

5. Major transactions were entered into by certain members of senior management in violation of Company internal controls. Certain members of Senior management failed properly to advise the Board of material financial conditions regarding major transactions.

98.     The foregoing "red flags" provided notice to Grant Thornton about Xybernaut management's character and lack of integrity. Management's lack of integrity have caused Grant Thornton to re-evaluate its risk assessments. GAAS requires, that risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors. *See* AU §§ 316.12, 316.14. The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present." AU § 316.25. One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is an "[i]nadequate monitoring of significant controls." AU § 316.17.

99.     Grant Thornton also failed to comply with Statement on Auditing Standards No. 8, in that Grant Thornton failed to take appropriate action relating to material misstatements of fact contained in the MD&A section of Xybernaut's Forms 10-K during the Class Period relating to the disclosures regarding earnings, as evidenced by the "lack of adherence to effective disclosure controls governing the Company's public disclosures. . . ." *See* AU §550.

**Grant Thornton Failed to Exercise Due Professional Care**

44

100.    Auditors must exercise due professional care in performing the audit and preparing the audit report. AU § 230.01. Due professional care concerns what the auditor does and how well he does it. AU § 230.04.

101.    Grant Thornton did not exercise due professional care because it failed to: obtain sufficient competent evidential matter to support the assertions in the financial statements; maintain an attitude of professional skepticism; and render an accurate audit report on behalf of Xybernaut.

102.    Grant Thornton violated GAAS Standard of Reporting No. 3 that requires that, informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report. Grant Thornton knew or recklessly that Xybernaut's disclosures were not reasonably adequate.

103.    For example, Grant Thornton ignored the fact that Xybernaut failed to make adequate disclosures concerning accounting policies relating to the recognition of revenue on the sales of certain products GAAP provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company. APB Opinion No. 22 ¶ 7. In fact, GAAP states that information about the accounting policies adopted by a reporting company is "essential" for financial statement users. *Id* ¶ 8. Accordingly, GAAP, in APB Opinion No. 22 ¶ 12, provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:
>
> a.    A selection from existing acceptable alternatives
>
> b.    Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry;

45

      c.      Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

104.    Accordingly, because Xybernaut "omit[ted] from the financial statements, including the accompanying notes, information that [was] required by generally accepted accounting principles, [Grant Thornton] should [have] express[ed] a qualified or an adverse opinion and should [have] provide[d] the information in [their] report." AU § 431.03.

105.    Grant Thornton violated GAAS Standard of Reporting No. 4 that requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. Grant Thornton should have stated that no opinion could be issued by it on Xybernaut's fiscal 2002 or 2003 financial statements or issued an adverse opinion stating that the fiscal 2002 and 2003 financial statements were not fairly presented.

106.    Grant Thornton violated GAAS General Standard No.2 that requires that independence in mental attitude is to be maintained by the auditor in all matters related to the assignment.

107.    Grant Thornton violated SAS No. 82 in that it failed to adequately consider the risk that the audit financial statements of Xybernaut were free from material misstatement, whether caused by errors or fraud. Grant Thornton knew or recklessly ignored numerous risks relevant to financial reporting including events and circumstances that occurred or existed at Xybernaut during the Class period, which adversely affected Xybernaut's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements. These events or circumstances include, but are not limited to:

- *Changes in operating environment.* Changes in the regulatory or operating environment can result in changes in competitive pressures and significantly different risks.

- *New or revamped information systems.* Significant and rapid changes in information systems can change the risk relating to internal control.

- *Rapid growth.* Significant and rapid expansion of operations can strain controls and increase the risk of a breakdown in controls.

- *New technology.* Incorporating new technologies into production processes or information systems may change the risk associates with internal control.

- *New business models, products, or activities.* Entering into business areas or transactions with which an entity has little experience may introduce new risks associated with internal control.

- *Corporate restructurings.* Restructurings may be accompanied by staff reductions and changes in supervision and segregation of duties that may change the risk associated with internal control.

- *New accounting pronouncements.* Adoption of new accounting principles or changing accounting principles may affect risks in preparing financial statements.

108.    Grant Thornton violated GAAS and the standards set forth in SAS No. 1 and SAS No. 53 by, among other things, failing to adequately plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

109.    Grant Thornton violated GAAS and the standards set forth in SAS No. 8, by failing to take appropriate action relating to material misstatements of fact contained in the MD&A section of Xybernaut's fiscal 2002 and 2003 Forms 10-K relating to the disclosures regarding the recognition of revenue recognition related to certain product sales.

110.    Grant Thornton violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting,

47

financial and managerial controls, to determine whether reliance thereon was justified, and if

such controls are not reliable, to expand the nature and scope of the auditing procedures to be

applied. The standard provides that a sufficient understanding of an entity's internal control

structure be obtained to adequately plan the audit and to determine the nature, timing and

extent of tests to be performed. AU § 150.02. In all audits, the auditor should perform

procedures to obtain a sufficient understanding of three elements of an entity's internal control

structure: the control environment, the accounting system, and control procedures. AU §

319.02.

111.    As a result of its failure to accurately report on Xybernaut's fiscal 2002

and 2003 financial statements, Grant Thornton failed in its role as an auditor as defined by

the SEC. SEC Accounting Series Release No. 296, Relationships Between Registrants and

Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No.

18044, states in part:

> Moreover, the capital formation process depends in large part on the
> confidence of investors in financial reporting. An investor's willingness
> to commit his capital to an impersonal market is dependent on the
> availability of accurate, material and timely information regarding the
> corporations in which he has invested or proposes to invest. The quality
> of information disseminated in the securities markets and the continuing
> conviction of individual investors that such information is reliable are
> thus key to the formation and effective allocation of capital.
> Accordingly, the audit function must be meaningfully performed and the
> accountants' independence not compromised. The auditor must be free
> to decide questions against his client's interests if his independent
> professional judgment compels that result.

112.    Grant Thornton's opinions, which represented that Xybernaut's fiscal

2002 and 2003 year end financial statements were presented in conformity with GAAP, were

materially false and misleading because Grant Thornton knew or was reckless in not knowing

that Xybernaut's fiscal 2002 and 2003 year end financial statements violated the principles of

48

fair reporting and GAAP. In the course of rendering its unqualified audit certification on Xybernaut's fiscal 2002 and 2003 year end financial statements, Grant Thornton knew it was required to adhere to each of the herein described standards and principles of GRAS, including the requirement that the financial statements comply in all material respects with GAAP. Grant Thornton, in issuing its unqualified opinions, knew or recklessly disregarded that by doing so it was engaging in gross departures from GAAS, thus making its opinions false, and issued such certifications knowing or recklessly disregarding that GAAS had been violated.

113.    Grant Thornton knew or recklessly disregarded facts that indicated that it should have: (a) disclaimed or issued adverse opinions on Xybernaut's fiscal 2002 and 2003 year end financial statements; or (b) withdrawn, corrected or modified its opinion for the years ended December 31, 2002 and 2003 to recognize Xybernaut's improper accounting and financial reporting stated above.

114.    Accordingly, Grant Thornton ignored the guidance under Section 10A of the Securities and Exchange Act which requires the auditor to design procedures "to identify related party transactions that are material to the financial statements or otherwise require disclosure therein. ... In addition, Grant Thornton failed to evaluate all the information available concerning the related party transactions, to determine whether they were adequately disclosed, in accordance with SFAS 57, in the financial statements. *See* AU § 334.11.

115.    Grant Thornton ignored that "evidence of significant or extensive undisclosed related party transactions" is indicative of a significant deficiency in the design or operation of internal control that could adversely affect Xybernaut's "ability to record process, summarize, and report financial data consistent with the assertions of management in the financial statements." AU § 325.21.

116.    Grant Thornton failed to consider whether additional audit testing was required for related party transactions, it also regularly failed to undertake some of the basic audit procedures in connection with related party transactions. AU § 334.08. Moreover, once an auditor has identified related party transactions, the auditor should apply the procedures he considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. AU § 334.09. The procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management. AU § 334.09.

117.    According to SAB No. 99, "quantitative benchmarks for assessing materiality (*e.g.*, a five percent threshold) do not apply in circumstances involving self-dealing and misappropriation of corporate assets by senior management."

## FIRST CLAIM

### VIOLATION OF SECTION 10(b) OF
### THE EXCHANGE ACT AND RULE 10b-5
### PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

118.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

119.    During the Class Period, Xybernaut, the Individual Defendants, and Grant Thornton, individually and in concert with one-another, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Xybernaut's securities; and (iii) cause plaintiffs and other members of the Class to purchase Xybernaut's securities at artificially

50

inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

120.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Xybernaut's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons as alleged below.

121.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

122.    Xybernaut, the Individual Defendants, and Grant Thornton, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to

conceal adverse material information about the business, operations and future prospects of Xybernaut as specified herein.

123.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Xybernaut's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Xybernaut and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Xybernaut's securities during the Class Period.

124.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts:  (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof, (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the

investing public which they knew or recklessly disregarded was materially false and misleading.

125.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Xybernaut's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

126.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Xybernaut's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Xybernaut's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Xybernaut securities during the Class Period at artificially high prices and were damaged thereby.

127.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of Xybernaut, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Xybernaut securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

128.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

129.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### VIOLATION OF SECTION 20(a) OF
### THE EXCHANGE ACT AGAINST THE INDIVIDUALS DEFENDANTS

130.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

131.    The Individual Defendants acted as controlling persons of Xybernaut within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various

54

statements which plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

132.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

133.    As set forth above, Xybernaut and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE,** plaintiff prays for relief and judgment, as follows:

1.    Determining that this action is a proper class action and appointing plaintiff as Lead Plaintiff and their counsel as Lead Counsel for the Class and certifying them as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

2.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

55

3.    Awarding plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

4.    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:     May 9, 2005                          Respectfully submitted,

**COHEN, MILSTEIN, HAUSFELD &
TOLL, P.L.L.C.**

By _____
Steven J. Toll (VA Bar #15300)
Daniel S. Sommers
Jason M. Leviton
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005
Telephone: 202-408-4600
Facsimile: 202-408-4699

**Plaintiff's Counsel**

56

# EXHIBIT 2

# xybernaut

**News Release**

**Xybernaut ® Announces Completion of Audit Committee Investigation, Board's Adoption of Recommendations**

Actions Taken Include Removal of Certain Company Officers, Appointment of Retired General William Tuttle as Interim Chairman and CEO and Resignation of Grant Thornton LLP as Auditors

FAIRFAX, VA – April 19, 2005 -- Xybernaut Corporation (NASDAQ: XYBRE) announced today that its previously disclosed Audit Committee Investigation had been completed and reached the following determinations, among others:

1. The Company's Chairman and CEO, Edward G. Newman, improperly used substantial Company funds for personal expenses and failed properly to substantiate expenses charged to the Company.

2. Members of the CEO's family employed by the Company were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.

3. The employment of certain members of the CEO's family was not disclosed in SEC filings as required by SEC disclosure regulations.

4. There has been a lack of adherence to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.

5. Major transactions were entered into by certain members of senior management in violation of Company internal controls. Certain members of senior management failed properly to advise the Board of material financial conditions regarding major transactions.

6. Certain members of senior management failed to disclose to the Audit Committee and the Board written correspondence by the Company's former Chief Financial Officer outlining serious concerns over the breakdown of internal controls; and

7. Edward G. Newman and Steven A. Newman affirmatively impeded the Audit Committee's investigation in material respects.

In response to the Audit Committee's Report and Recommendations, the Board today approved the following actions:

1. Edward G. Newman was removed as Chairman of the Board and Chief Executive Officer of the Company, and from all other positions he holds with any Company subsidiaries or affiliates.

2. Steven A. Newman was removed as President and Chief Operating Officer of the Company, and Vice Chairman of the Board, and from all other positions he holds with any Company subsidiaries or affiliates.

3. The Board formally requested the resignations of Edward G. and Steven A. Newman as Directors of the Company, but neither individual has agreed to resign from the Board at this time.

4. Retired General William Tuttle was appointed as the Company's Interim Chairman of the Board and Chief Executive Officer, while a search is conducted for new management.

5. The Board authorized the retention of financial experts to assist the Board in maximizing shareholder value.

6. In an effort to promote the independence of the Company's Board, three directors of the Company — James J. Ralabate, Dr. Edwin Vogt and Martin Weisberg, each of whom provides other services for the Company — offered to resign from the Board. The Board determined to defer its acceptance of these offers upon an orderly transition to a new Board.

The Company also announced that Grant Thornton LLP has resigned as the Company's independent auditors. The Company received a letter from Grant Thornton LLP on April 14, 2005, stating that Grant Thornton LLP has concluded that, in its professional judgment, it can no longer rely on management's representations and has

resigned as the Company's registered independent accounting firm. On April 8, 2005, the Company advised investors and others that, based upon a letter the Company received from Grant Thornton LLP on April 6, 2005, no reliance should be placed upon certain of the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors. In light of Grant Thornton LLP's resignation, the Company advises investors and others to continue to refrain from relying upon any of the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors, Grant Thornton LLP.

The reports of Grant Thornton LLP on the Company's financial statements for the 2002 and 2003 fiscal years did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles. In addition, in connection with the audits of the Company's financial statements for fiscal years 2002 and 2003, and in the subsequent interim periods, there were no disagreements between the Company and Grant Thornton LLP on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure which, if not resolved to the satisfaction of Grant Thornton LLP, would have caused Grant Thornton LLP to make reference to the matter in connection with its report.

However, as noted above, Grant Thornton LLP has now concluded that, in its professional judgment, it can no longer rely on management's representations. After Grant Thornton LLP was advised of the results of the Audit Committee investigation, Grant Thornton LLP advised the Audit Committee's counsel that certain members of senior management failed to disclose facts material to the financial statements and the weaknesses in the internal controls. The Audit Committee has discussed the basis for Grant Thornton LLP's conclusion with Grant Thornton LLP and has authorized Grant Thornton LLP to respond fully to the inquiries of any successor accountant concerning this subject. The Audit Committee has reviewed the Company's disclosure in this press release and in the Company's related Form 8-K with Grant Thornton LLP.

In light of Grant Thornton LLP's resignation as the Company's independent auditor and the other matters discussed above, the Company is unable to predict when new auditors will be selected and its Form 10-K will be filed.

About Xybernaut
Xybernaut Corporation is a leading provider of wearable/mobile computing hardware, software and services, bringing communications and full-function computing power in a hands-free design to people when and where they need it. Headquartered in Fairfax, Virginia, Xybernaut has offices and subsidiaries in Europe (Benelux, Germany, UK) and Asia (Japan, China, Korea). Visit the Xybernaut Web site at www.xybernaut.com. Product photos are also available directly from Xybernaut.

Xybernaut and the Xybernaut logo are trademarks or registered trademarks of Xybernaut Corporation in the USA and other countries. All other brand and product names are or may be trademarks of, and are used to identify products or services of, their respective owners.

# # #

This press release contains forward-looking statements within the meaning of The Private Securities Litigation Reform Act of 1995 (the "Act"). In particular, when used in the preceding discussion, the words "plan," "confident that," "believe," "scheduled," "expect," or "intend to," and similar conditional expressions are intended to identify forward-looking statements within the meaning of the Act and are subject to the safe harbor created by the Act. Such statements are subject to certain risks and uncertainties and actual results could differ materially from those expressed in any of the forward-looking statements. Such risks and uncertainties include, but are not limited to, market conditions, the availability of components and successful production of the Company's products, general acceptance of the Company's products and technologies, competitive factors, timing, and other risks described in the Company's SEC reports and filings.

# EXHIBIT 3



**News Release**

**Xybernaut ® Announces Creation of new office of Chairman of the Board and election of William Tuttle, Harry E. Soyster, and Marc Ginsberg as Co-Chairmen**

COMPANY ALSO ANNOUNCES COMMENCEMENT OF INVESTIGATION BY FEDERAL PROSECUTORS AND SEVERE LIQUIDITY CONCERNS

FAIRFAX, VA – April 25, 2005 -- Xybernaut Corporation (NASDAQ: XYBRE) today announced that William Tuttle and two other outside directors, Harry E. Soyster and Marc Ginsberg, will serve as co-chairmen in a newly created Office of the Chairman of the Board. Although the three co chairmen will act as directors and not as management, they will provide counsel and be a resource to senior management.

On April 23, 2005, Tuttle formally resigned as the Company's Interim Chairman and Chief Executive Officer and joined Soyster and Ginsberg in forming the newly created Office of Chairman of the Board. Tuttle's resignation was based upon his concerns about his ability to satisfy unilaterally the significant time commitments required to effectively address the needs of shareholders and employees. Tuttle also stated that he remains committed to continued participation in the effort to determine the best way forward for the Company, working along with Soyster and Ginsberg.

The Company also announced that the Company was contacted Friday, April 22 by the U. S. Attorney's Office for The Eastern District of Virginia, which is opening an investigation. In addition, the Audit Committee, through its legal counsel, has contacted the Securities and Exchange Commission in connection with the previously disclosed Audit Committee investigation and findings. The Company will cooperate fully in these investigations and any others.

The Company also affirmed that it continues to face a severe liquidity crisis and possible insolvency. There can be no assurances that the Company will have sufficient cash to meet its financial obligations or fund continuing operations. The Office of the Chairman of the Board is authorized to retain a consultant with financial and management restructuring expertise. The Company intends to work with such adviser to reduce costs, conserve cash, and obtain advice regarding restructuring and other alternatives to maximize shareholder value.

About Xybernaut
Xybernaut Corporation is a leading provider of wearable/mobile computing hardware, software and services, bringing communications and full-function computing power in a hands-free design to people when and where they need it. Headquartered in Fairfax, Virginia, Xybernaut has offices and subsidiaries in Europe (Benelux, Germany, UK) and Asia (Japan, China, Korea). Visit the Xybernaut Web site at www.xybernaut.com. Product photos are also available directly from Xybernaut.

Xybernaut and the Xybernaut logo are trademarks or registered trademarks of Xybernaut Corporation in the USA and other countries. All other brand and product names are or may be trademarks of, and are used to identify products or services of, their respective owners.

# # #

This press release contains forward-looking statements within the meaning of The Private Securities Litigation Reform Act of 1995 (the "Act"). In particular, when used in the preceding discussion, the words "plan," "confident that," "believe," "scheduled," "expect," or "intend to," and similar conditional expressions are intended to identify forward-looking statements within the meaning of the Act and are subject to the safe harbor created by the Act. Such statements are subject to certain risks and uncertainties and actual results could differ materially from those expressed in any of the forward-looking statements. Such risks and uncertainties include, but are not limited to, market conditions, the availability of components and successful production of the Company's products, general acceptance of the Company's products and technologies, competitive factors, timing, and other risks described in the Company's SEC reports and filings.

# EXHIBIT 4

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| VIRGINIA EASTERN | | | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 6,197 | 6,052 | 10,908 | 7,207 | 6,403 | 6,107 | U.S. | Circuit |
| | Terminations | | 5,950 | 6,014 | 10,209 | 7,183 | 6,199 | 5,785 | | |
| | Pending | | 3,507 | 3,465 | 3,505 | 2,954 | 2,986 | 2,904 | | |
| | % Change in Total Filings | Over Last Year | | 2.4 | | | | | 43 | 6 |
| | | Over Earlier Years | | | -43.2 | -14.0 | -3.2 | 1.5 | 62 | 8 |
| | Number of Judgeships | | 11 | 11 | 11 | 11 | 10 | 10 | | |
| | Vacant Judgeship Months** | | 4.5 | .0 | .0 | 9.5 | .0 | .3 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 564 | 550 | 991 | 655 | 640 | 611 | 22 | 2 |
| | | Civil | 409 | 394 | 843 | 552 | 533 | 505 | 32 | 3 |
| | | Criminal Felony | 115 | 126 | 122 | 103 | 107 | 106 | 17 | 2 |
| | | Supervised Release Hearings** | 40 | 30 | 26 | - | - | - | 12 | 1 |
| | Pending Cases | | 319 | 315 | 319 | 269 | 299 | 290 | 74 | 8 |
| | Weighted Filings** | | 544 | 558 | 634 | 566 | 618 | 597 | 25 | 3 |
| | Terminations | | 541 | 547 | 928 | 653 | 620 | 579 | 23 | 1 |
| | Trials Completed | | 31 | 32 | 31 | 36 | 39 | 42 | 9 | 1 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 5.1 | 5.1 | 4.7 | 5.1 | 5.2 | 5.1 | 6 | 1 |
| | | Civil** | 5.7 | 5.3 | 4.4 | 3.4 | 4.3 | 4.1 | 3 | 1 |
| | From Filing to Trial** (Civil Only) | | 9.2 | 8.0 | 9.0 | 9.9 | 8.2 | 9.4 | 1 | 1 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 13 | 58 | 24 | 89 | 43 | 13 | | |
| | | Percentage | .5 | 2.5 | 1.0 | 4.2 | 1.9 | .6 | 4 | 2 |
| | Average Number of Felony Defendants Filed Per Case | | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 41.26 | 42.10 | 45.60 | 48.72 | 41.51 | 40.86 | | |
| | | Percent Not Selected or Challenged | 39.9 | 41.9 | 50.6 | 52.9 | 49.3 | 45.8 | | |

| 2004 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 4498 | 89 | 7 | 1265 | 38 | 27 | 309 | 426 | 1260 | 157 | 459 | 9 | 452 |
| Criminal* | 1251 | 99 | 7 | 259 | 9 | 38 | 442 | ** | 23 | 247 | 7 | 4 | 116 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|
| **DELAWARE** | | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | 1,797 | 1,362 | 2,028 | 1,004 | 1,303 | 1,033 | U.S. | Circuit |
| | Terminations | 1,516 | 1,507 | 1,478 | 1,020 | 955 | 861 | | |
| | Pending | 2,085 | 1,836 | 1,999 | 1,477 | 1,502 | 1,154 | | |
| | % Change in Total Filings — Over Last Year | 31.9 | | | | | | 5 | 2 |
| | Over Earlier Years | | | -11.4 | 79.0 | 37.9 | 74.0 | 4 | 2 |
| Number of Judgeships | | 4 | 4 | 4 | 4 | 4 | 4 | | |
| Vacant Judgeship Months** | | .0 | 1.9 | 3.1 | .0 | .0 | .0 | | |
| ACTIONS PER JUDGESHIP | FILINGS — Total | 449 | 340 | 507 | 251 | 326 | 258 | 52 | 3 |
| | Civil | 414 | 306 | 462 | 233 | 307 | 240 | 29 | 3 |
| | Criminal Felony | 29 | 25 | 38 | 18 | 19 | 18 | 91 | 6 |
| | Supervised Release Hearings** | 6 | 9 | 7 | - | - | - | 90 | 4 |
| | Pending Cases | 521 | 459 | 500 | 369 | 376 | 289 | 20 | 2 |
| | Weighted Filings** | 534 | 424 | 516 | 379 | 389 | 320 | 31 | 1 |
| | Terminations | 379 | 377 | 370 | 255 | 239 | 215 | 64 | 4 |
| | Trials Completed | 19 | 23 | 18 | 16 | 19 | 13 | 47 | 2 |
| MEDIAN TIMES (months) | From Filing to Disposition — Criminal Felony | 9.1 | 8.3 | 9.8 | 8.0 | 6.6 | 6.0 | 68 | 2 |
| | Civil** | 14.0 | 11.2 | 8.2 | 12.6 | 10.9 | 11.5 | 93 | 5 |
| | From Filing to Trial** (Civil Only) | 26.0 | 24.0 | 22.5 | 21.0 | 24.0 | 19.7 | 58 | 3 |
| OTHER | Civil Cases Over 3 Years Old** — Number | 65 | 66 | 99 | 77 | 70 | 38 | | |
| | Percentage | 3.4 | 3.9 | 5.4 | 5.5 | 4.9 | 3.5 | 43 | 3 |
| | Average Number of Felony Defendants Filed Per Case | 1.2 | 1.3 | 1.1 | 1.3 | 1.2 | 1.3 | | |
| | Jurors — Avg. Present for Jury Selection | 38.50 | 34.98 | 33.84 | 32.68 | 35.75 | 30.23 | | |
| | Percent Not Selected or Challenged | 20.9 | 24.0 | 24.4 | 19.9 | 28.5 | 15.1 | | |

| 2004 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1655 | 20 | 1 | 238 | 10 | 5 | 28 | 72 | 56 | 198 | 135 | 2 | 890 |
| Criminal* | 115 | 9 | 5 | 40 | - | 4 | 24 | ** | 2 | 19 | - | 6 | 6 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not
\*\* See "Explanation of Selected Terms."

http://www.uscourts.gov/cgi-bin/cmsd2004.pl                                    5/17/2005

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE XYBERNAUT CORP | ) | MDL DOCKET NO._____ |
| SECURITIES LITIGATION | ) | |

**CERTIFICATE OF SERVICE**

I, Jason M. Leviton, hereby certify that on June 10, 2005 true and accurate copies of the

foregoing (1) Don R. Heilman, Simona Zucarelli, and Dean Lawthers' Memorandum in Support

of Their Motion to Transfer Related Actions to the United States District Court for The Eastern

District of Virginia and To Consolidate, Or, in the Alternative, Coordinate, All Pretrial

Proceedings Therein, and (2) Don R. Heilman, Simona Zuccarelli, and Dean Lawther's Motion to

Transfer Related Actions to the United States District Court for The Eastern District of Virginia

and To Consolidate, Or, in the Alternative, Coordinate, All Pretrial Proceedings Therein, were

served on the following counsel of record via UPS Overnight to:

**PLAINTIFFS:**

**SHEPPHERD, FINKELMAN, MILLER
  & SHAH, LLC**
James E. Miller
Patrick A. Klingman
Karen M. Leser
65 Main Street
Chester, CN 06412
Tel: (860) 526-1100
*Counsel for Robert H. Aylor, Jr.*
*Counsel for Joseph D. Wauhop*

**SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLC**
Scott R. Shepherd
James C. Shah
35 East State Street
Media, PA 19063
Tel: (610) 891-9880
*Counsel for Robert H. Aylor, Jr.*
*Counsel for Joseph D. Wauhop*

1

**PLAINTIFFS:**

**LANDSKRONER, GRIECO,**
   **MADDEN, LTD.**
Jack Landskroner
Paul Grieco
1360 West 9th Street, Suite 200
Cleveland, OH 44113
Tel: (216) 522-9000
*Counsel for Robert H. Aylor, Jr.*
*Counsel for Joseph D. Wauhop*

**SCHATZ & NOBEL, P.C.**
Andrew M. Schatz
Jeffrey S. Nobel
One Corporate Center
20 Church Street
Hartford, CN 06103
Tel: (860) 493-6292
*Counsel for Robert H. Aylor, Jr.*
*Counsel for Joseph D. Wauhop*

**ROSENTHAL, MONHAIT, GROSS**
   **& GODDESS**
Jessica Zeldin
Mellon Bank Center, Suite 1401
919 Market Street
Wilmington, DE 19899-1070
Tel: (302) 656-1433
*Counsel for Robert H. Aylor, Jr.*
*Counsel for Joseph D. Wauhop*
*Counsel for Charles W. Smith*

**MILBERG WEISS, BERSHAD**
   **& SCHULMAN LLP**
Seth D. Rigrodsky
Ralph N. Sianni
Brian D. Long
919 North Market Street
Suite 411
Wilmington, DE 19801
Tel: (302) 984-0597
*Counsel for Moshe Tal*
*Counsel for Jeffrey M. Jaskol*
*Counsel for Stacey J. Jaskol*
*Counsel for Christina W. & John Donnelly,*
*James G. Williamson & Richard W.*
*Dearborn*

**MILBERG WEISS, BERSHAD**
   **& SCHULMAN LLP**
Steven G. Schulman
Peter E. Seidman
David P. Brower
Sharon M. Lee
One Pennsylvania Plaza
New York, NY 10019
Tel: (212) 594-5300
*Counsel for Moshe Tal*
*Counsel for Jeffrey M. Jaskol*
*Counsel for Stacey J. Jaskol*
*Counsel for Christina W. & John Donnelly,*
*James G. Williamson & Richard W.*
*Dearborn*

**STULL, STULL & BRODY**
Jules Brody
Aaron Brody
Tzivia Brody
6 East 45th Street
New York, NY 10017
Tel: (212) 687-7230
*Counsel for Moshe Tal*

2

**PLAINTIFFS:**

**WEISS & LURIE**
Joseph H. Weiss
551 Fifth Avenue
New York, NY 10176
Tel: (212) 682-3025
*Counsel for Moshe Tal*

Bruce Murphy, Esq.
265 Llwyds Lane
Vero Beach, FL 32963
Tel: (772) 231-4202
*Counsel for Michael Fehrenbacher*

**FEDERMAN & SHERWOOD**
William B. Federman
Wm. Pat Wasson
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
Tel: (405) 235-1560
*Counsel for Charles W. Smith*

**SPECTOR, ROSEMAN & KODROFF, PC**
Robert M. Roseman
Andrew D. Abramowitz
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 496-0300
*Counsel for Dean Lawthers*

**CHIMICLES & TIKELLIS, LLP**
Pamela S. Tikellis
Robert J. Kriner
A. Zachary Naylor
Robert Davis
One Rodney Square, 5th Floor
920 King Street
Wilmington, DE 19801
Tel: (302) 656-2500
*Counsel for Michael Fehrenbacher*

**HOLMAN LAW OFFICE**
Thomas A. Holman
One Pennsylvania Plaza, Suite 4632
New York, NY 10119
Tel: (212) 699-4596
*Counsel for Christina W. & John Donnelly,*
*James G. Williamson & Richard W.*
*Dearborn*

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
Dale MacDiarmid
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
*Counsel for Simona Zuccarelli*

3

**DEFENDANTS:**

**McGUIRE WOODS LLP**
Robert Plotkin
Washington Square
1050 Connecticut Avenue, NW
Suite 1200
Washington, DC 20036
Tel: (202) 857-1700
*Counsel for Xybernaut Corporation*

**REES, BROOME & DIAZ, P.C.**
Robert E. Scully, Jr.
8133 Leesburg Pike, 9th Floor
Tysons Corner, VA 22182
Tel: (703) 790-1911
*Counsel for Steven A. Newman, M.D.*

**DIMURA GINSBERG P.C.**
John M. Tran
908 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 684-4333
*Counsel for Edward G. Newman*

Bruce C. Hayden
15301 Limestone School Road
Leesburg, VA 20176
*(Counsel Unknown)*

Thomas D. Davis
7321 Fairwood Lane
Falls Church, VA 22406
*(Counsel Unknown)*

Richard P. LeFleur
**c/o GRANT THORNTON LLP**
2070 Chain Bridge Road, Suite 300
Vienna, VA 22182
*(Counsel Unknown)*

Jason M. Leviton

4

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE XYBERNAUT CORP | ) | MDL DOCKET NO._____ |
| SECURITIES LITIGATION | ) | |

**SUPPLEMENTAL CERTIFICATE OF SERVICE**

I, Jason M. Leviton, hereby certify that on June 10, 2005 true and accurate copies of the

foregoing (1) Don R. Heilman, Simona Zucarelli, and Dean Lawthers' Memorandum in Support

of Their Motion to Transfer Related Actions to the United States District Court for The Eastern

District of Virginia and To Consolidate, Or, in the Alternative, Coordinate, All Pretrial

Proceedings Therein, and (2) Don R. Heilman, Simona Zuccarelli, and Dean Lawther's Motion to

Transfer Related Actions to the United States District Court for The Eastern District of Virginia

and To Consolidate, Or, in the Alternative, Coordinate, All Pretrial Proceedings Therein, were

served on the following via UPS Overnight to:

**U.S. District Court for the
Eastern District of Virginia, Alexandria Division**

Elizabeth H. Paret
Clerk of the Court
U.S.D.C., Eastern District of Virginia
Albert V. Bryan U.S. Courthouse
401 Courthouse Square
Alexandria, VA  22314

1

**U.S. District Court**
**District of Delaware, Wilmington Divison**

Clerk of the Court
United States District Court for the
District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Wilmington, DE 19801

Jason M. Leviton

2